Case Nos. 23-124, 23-150, and 23-188

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MACY'S INC.,

*Petitioner/Cross-Respondent/Intervenor,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner,*

and

INTERNATIONAL UNION OF OPERATING ENGINEERS,
STATIONARY ENGINEERS, LOCAL 39,

*Respondent and Intervenor.*

On Petition for Review from the National Labor Relations Board
Case No. 20-CA-270047
The Honorable McFerran, Kaplan, and Wilcox

**Combined Opening and Answering Brief of Macy's Inc.**

Dylan B. Carp
JACKSON LEWIS P.C.
50 California Street, 9th Floor
San Francisco, California 94111-4615
Telephone: (415) 394-9400
Dylan.Carp@jacksonlewis.com

Daniel D. Schudroff
JACKSON LEWIS P.C.
666 Third Avenue, 29th Floor
New York, New York 10017-4030
Telephone: (212) 545-4000
Daniel.Schudroff@jacksonlewis.com

*Attorneys for Petitioner/Cross-Respondent/Intervenor*
MACY'S INC.

## <u>Rule 26.1 Disclosure Statement</u>

Macy's Inc. is a publicly held corporation and it has no parent corporation.

Further, the only publicly held corporation that currently owns 10% or more of the

common stock of Macy's Inc. is The Vanguard Group, Inc.

Dated: August 23, 2023                    Respectfully submitted,


                                          s/ Dylan B. Carp
                                          Dylan B. Carp
                                          Daniel D. Schudroff
                                          JACKSON LEWIS P.C.

                                          *Attorneys for Petitioner/Cross-*
                                          *Respondent/Intervenor*
                                          MACY'S INC.

i

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

STATUTORY AUTHORITIES ...............................................................4

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................4

STATEMENT OF THE CASE..................................................................5

    A.    Background on Macy's and the Union. ........................................5

    B.    The COVID-19 pandemic devastates Macy's business ...............6

    C.    The parties fail to negotiate a successor CBA when the Union rejects Macy's LBF ...............................................................7

    D.    The Union strikes and engages in serious misconduct, including conduct that Macy's reasonably perceives as sabotage..............7

    E.    The parties continue discussions during the strike ....................12

    F.    The Union makes a surprising "counteroffer" the day before Thanksgiving. ..................................................................13

    G.    On December 4, Macy's rejects the Union's counteroffer, and the Union restates its rejection of Macy's LBF and unexpectedly offers to return to work...............................................................13

    H.    On Monday, December 7, some Union members return to work without authorization and engage in further misconduct that Macy's reasonably perceives as sabotage .................................15

    I.    Macy's informs the Union its members are locked out until there is an agreement in place......................................................16

    J.    Macy's makes a new offer three days into the lockout ..............18

SUMMARY OF ARGUMENT ...............................................................21

ii

STANDARD OF REVIEW ....................................................................23

ARGUMENT ......................................................................................24

I.   The Court lacks jurisdiction because the Union is not a person aggrieved under Section 160(f)..................................................................274

II.  The Board erred in holding that Macy's unlawfully locked out the Union's members ......................................................................................27

     A.  The Board failed to follow Supreme Court precedent in evaluating Macy's lockout, requiring reversal ....................................................28

     B.  Macy's did not engage in conduct "inherently destructive of important employee rights" when it started an offensive lockout .......................32

     C.  Macy's did not engage in conduct "inherently destructive of important employee rights" when it started a defensive lockout; even if it did, finding a violation of the Act would not strike the proper balance ....41

     D.  The Board erred in the remedies issued against Macy's, if any .........44

         1. Macy's is liable for at most three days' remedies because it cured and established no adverse impact on later bargaining .......................44

         2. *Thryv* was wrongly decided ............................................................47

         3. The Board erred in applying *Thryv* retroactively.  ..........................52

III. The Union is not entitled to the extraordinary relief that it seeks ...............54

CONCLUSION ....................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*800 River Rd. Operating Co. v. NLRB*,
 784 F.3d 902 (3d Cir. 2015) ..................................................................28, 30, 31

*Alan Ritchey, Inc.*,
 359 NLRB 396 (2014) ...........................................................................52, 53, 54

*Albermarle Paper Co. v. Moody*,
 422 U.S. 405 (1975)..............................................................................................51

*Alden Leeds, Inc.*,
 357 NLRB 84 (2011), enfd. 812 F.3d 159 (D.C. Cir. 2018) .................35, 36, 46

*Am. Ship Bldg. Co. v. NLRB*,
 380 U.S. 300, 318 (1965)....................................................................................33

*Amalgamated Meat Cutters v. NLRB*,
 267 F.2d 169 (1st Cir. 1959).............................................................................24

*Amerinox Processing, Inc.*,
 371 NLRB No. 105 (2022) ................................................................................55

*Ancor Concepts, Inc.*,
 323 NLRB 742 (1997) .......................................................................................35

*Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*,
 464 F.3d 1003 (9th Cir. 2006) .........................................................................37

*Auto. Workers v. Russell*,
 356 U.S. 634 (1958)......................................................................................47, 48

*Bechtel Constr., Inc. v. United Bd. of Carpenters & Joiners*,
 812 F.2d 1220 (9th Cir.1987) ..........................................................................26

*Black Magic Resources*,
 317 NLRB 721 (1995).........................................................................................49

*In re Board Infrastructure Envtl. Litig.*,
 915 F.3d 1213 (9th Cir. 2019) .........................................................................37

*Boehringer Ingelheim Vetmedica, Inc.*,
   350 NLRB 678 (2007) ....................................................................43

*Central Illinois Public Service Co.*,
   326 NLRB 928 (1998) ....................................................................32

*Christensen v. Harris Cnty.*,
   529 U.S. 576 (2000)...................................................................39, 40

*Dash v. NLRB*,
   793 F.2d 1062 (9th Cir. 1986) .......................................................42

*Dayton Newspapers*,
   339 NLRB 650 (2003) ........................................................35, 36, 39

*Eads Transfer*
   989 F.2d 373, 377 (9th Cir. 1993) (enforcing 304 NLRB 711
   (1991) ...............................................................................33, 34, 38

*Esmark, Inc. v. NLRB*,
   887 F.2d 739, 748 (7th Cir. 1989) .................................................29

*Field Bridge Associates*,
   306 NLRB 322 (1992) ....................................................................35

*Greensburg Coca-Cola Bottling Co.*,
   311 NLRB 1022, 1029 (1993) ........................................................46

*Griffin v. Oceanic Contractors, Inc.*,
   458 U.S. 564 (1982).......................................................................37

*Gurley v. Hunt*,
   287 F.3d 728 (8th Cir. 2002) .........................................................48

*HTH Corp.*,
   361 NLRB 709 (2014) ..............................................................55, 56

*Int'l All. of Theatrical Stage Emps., Loc. 15 v. NLRB*,
   957 F.3d 1006 (9th Cir. 2020) .......................................................23

*Int'l Union of Operating Eng'rs Local 501 v. NLRB*,
   949 F.3d 477 (9th Cir. 2020) ...............................................*passim*

v

*Lemoyne-Owen Coll. v. NLRB,*
    357 F.3d 55 (D.C. Cir. 2004) ..................................................................35

*Levitz Furniture Co. of the Pacific,*
    333 NLRB 717 (2001) ...........................................................................52

*Liquor Salesmen's Union Local 2 v. NLRB,*
    664 F.2d 1200 (D.C. Cir. 1981) ...........................................................24

*Local 15, Int'l Bhd Elec. Workers v. NLRB,*
    429 F.3d 651 (7th Cir. 2006) ...............................................29, 37, 38

*Local Joint Exec. Bd. of Las Vegas v. NLRB,*
    883 F.3d 1129 (9th Cir. 2018) .............................................................23

*Macy's Inc,*
    372 NLRB No. 42 (Jan. 17, 2023) ...............................................*passim*

*Meridian Automotive Sys.*, 2007 NLRB GCM LEXIS 1, Case No. 9-
    CA-42952 (Jan. 16, 2007) ..............................................................38, 39

*Movers and Warehousemen's Assn. of Washington DC,*
    224 NLRB 356 (1976), enfd. 550 F.2d 962 ......................................44

*NLRB v. Bingham-Willamette Co.,*
    857 F.2d 661 (9th Cir. 1988) ...............................................................23

*NLRB v. Brown,*
    380 U.S. 278 (1965) ...............................................................................28

*NLRB v. Calkins,*
    187 F.3d 1080 (9th Cir. 1999) ......................................................23, 27

*NLRB v. Great Dane Trailers, Inc.,*
    388 U.S. 26 (1967) .......................................................................*passim*

*NLRB v. Pier Sixty, LLC,*
    855 F.3d 115 (2d Cir. 2017) ................................................................38

*Portland Willamette Co. v. NLRB,*
    534 F.2d 1331 (9th Cir. 1976) .............................................................29

*SEIU United Health Workers-West v. NLRB*,
   No. 15-71671, 2015 U.S. App. LEXIS 16933 (9th Cir. July 28,
   2015) .................................................................................................25

*Shepherd v. NLRB*,
   459 U.S. 344 (1983)........................................................................48

*Skidmore v. Swift & Co.*,
   323 U.S. 134, 140 (1944).................................................................39

*SNE Enterprises*,
   344 NLRB 673 (2005) .....................................................................22

*Sociedad Española de Auxilio Mutuo y Beneficiencia*,
   342 NLRB 458 (2004).....................................................................43

*Standard Drywall, Inc. v. NLRB*,
   547 F. App'x 809 (9th Cir. 2013) ....................................................24

*Stepan Co.*,
   352 NLRB 79 (2008) .......................................................................43

*Teamsters Local 455 v. NLRB*,
   765 F.3d 1198 (10th Cir. 2014) (Gorsuch, J.) .................................32

*The Guild San Jose*,
   370 NLRB No. 47 (2020) ................................................................56

*The Voorhees Care & Rehabilitation Center*,
   371 NLRB No. 22, at *4 n. 14 (2021) .............................................49

*Thryv, Inc.*,
   371 NLRB No. 37 (2021) ................................................................50

*Thryv, Inc.*,
   372 NLRB No. 22 (Dec. 13, 2022)............................................*passim*

*United States Postal Service*,
   339 NLRB 1162 (2003) ...................................................................55

*United States v. Burke*,
   504 U.S. 229 (1992).................................................................50, 51

*Walker v. Ford Motor Co.*,
  684 F.2d 1355 (11th Cir. 1982) ..........................................................51

**Statutes**

29 C.F.R. § 102.54 .................................................................................46

28 U.S.C.
  § 2112(a)(1) ......................................................................................26
  § 2112(a)(3) ...........................................................................4, 20, 26

29 U.S.C.
  § 151......................................................................................................3
  § 158(a)(3) ........................................................................................28
  § 160(a)..................................................................................................3
  § 160(c)................................................................................................51
  § 160(f)..............................................................................3, 4, 21, 24

Civil Rights Act of 1964 Title VII.............................................50, 51, 52

Civil Rights Act of 1991 ........................................................................51

National Labor Relations Act (*Act*) ....................................................*passim*
  § 7........................................................................................................55
  § 8(a)(1) ............................................................................................19
  § 8(a)(3) ......................................................................................*passim*
  § 10(a) ..................................................................................................3
  § 10(c) .........................................................................................47, 51
  § 10(f)..........................................................................................*passim*

**Other Authorities**

Black's Law Dictionary, p. 394 (7th Edition) .......................................50

Board Rules Remedies Must Compensate Employees for All Direct or
  Foreseeable Financial Harms, https://www.nlrb.gov/news-
  outreach/news-story/board-rules-remedies-must-compensate-
  employees-for-all-direct-or .................................................................47

## INTRODUCTION

Three months into a strike, employees in a bargaining unit represented by Stationary Engineers Local 39, International Union of Operating Engineers, AFL-CIO ("Union") suddenly offered to return to work to Petitioner Macy's Inc. ("Macy's"). They did so after (1) engaging in egregious homophobic conduct towards co-workers, (2) harassing customers, (3) committing acts of apparent sabotage, and (4) restating their objection of Macy's last, best and final offer ("LBF"). Macy's locked them out, explaining that, in support of its bargaining position, it would not reinstate them until the parties had agreed to a new collective bargaining agreement ("CBA"). The National Labor Relations Board ("NLRB" or "Board") held that the Board's General Counsel proved that Macy's violated the National Labor Relations Act ("Act") because, when Macy's commenced the lockout, it did not have a contract offer on the table. The Board awarded all relief that the General Counsel sought.

This Court lacks jurisdiction over these proceedings because the Union, which petitioned for review here, is not an aggrieved party. The Union sought only additional, extraordinary remedies that the Board's General Counsel did not seek, solely to defeat Macy's statutory right to petition for review in a circuit where it conducts business, the United States Court of Appeals for the Fifth Circuit

1

("Fifth Circuit"). The Court should dismiss the Union's petition and transfer the remaining proceedings to that court.

If it reaches the merits, the Court should hold that the Board erred. The Board failed to discuss or apply binding Supreme Court precedent holding when, as here, an employer acts without antiunion animus, the Board may find a violation of Section 8(a)(3) of the Act only if the employer's actions are "inherently destructive of important employee rights" and finding a violation strikes the right balance between the asserted business justifications and the invasion of employee rights considering the Act and its policy. *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33 (1967). This Court should remand for the Board to apply binding caselaw.

That said, if this Court excuses the Board's failure to follow the law and engages in the requisite analysis for the first time on appeal, it should hold that the Board erred in finding a violation. Under Board law and decisions from this Circuit and others, Macy's permissibly imposed an offensive lockout by communicating its position that a new contract must be in place before it would permit the employees to return to work. That rule is especially sensible here, because when the Union demanded to return to work it explicitly stated that it would not accept Macy's LBF. Thus, even if Macy's had renewed its LBF when it started the lockout, that would have been a pointless act. Macy's lockout was also

2

permissible for the defensive reason that it reasonably feared the employees would continue a campaign of sabotage if permitted to return without a new CBA.

As to remedies, if any, the Board erred in finding Macy's liable for backpay for the entire lockout period, because Macy's cured any supposed violation within three days of initiating the lockout and showed that there was no adverse impact on later bargaining. The Board also erred in awarding make-whole remedies for any purportedly "direct or foreseeable" pecuniary harms suffered as a result of the lockout. On the other hand, the Board was well within its discretion in rejecting the Union's belated request for extraordinary remedies, raised for the first time with the Union's cross-exceptions.

Thus, if it reaches the merits in this case, the Court should grant Macy's Petition for Review, deny the Union's Petition for Review, and deny enforcement of the Board's Order.

## JURISDICTIONAL STATEMENT

The NLRB had jurisdiction under Section 10(a) of the National Labor Relations Act ("Act"), as amended. 29 U.S.C. §§ 151, 160(a). The NLRB issued its Decision and Order on January 17, 2023, reported as *Macy's Inc*, 372 NLRB No. 42 (Jan. 17, 2023).

Macy's, as a person "aggrieved" by the Board's final order, petitioned for review under 29 U.S.C. § 160(f) in the Fifth Circuit on January 19, 2023. There is

no time limit under Section 160(f) by which a petition for review must be filed. On January 25, 2023, the Union petitioned for review in this Court. Because two petitions for review were filed in two courts of appeals, the Judicial Panel on Multidistrict Litigation consolidated the two cases pursuant to 28 U.S.C. § 2112(a)(3), randomly selecting this Circuit as the one in which consolidation would occur.

But the Union had no right to petition for review under Section 160(f). Macy's is the only party aggrieved by the Board's final order. The Union won at the Board below. Thus, this case never should have been presented to the Judicial Panel for consolidation, which in turn should not have selected this Court to hear Macy's petition. As a result, this Court lacks jurisdiction over these consolidated matters.

## STATUTORY AUTHORITIES

Relevant statutory authorities appear in the Addendum to this brief.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the Court has jurisdiction because the Union had standing to petition for review as a person aggrieved under 29 U.S.C. § 160(f). Only if the Court has jurisdiction are the other issues below also presented.

2. Whether the NLRB erred in finding that Macy's lockout violated the Act.

4

3.      Whether the NLRB erred in finding that Macy's failed to cure any technical violation even though it made a full offer to the Union three days after the start of the lockout.

4.      Whether the NLRB correctly held in *Thryv, Inc.*, 372 NLRB No. 22 (Dec. 13, 2022) that make-whole remedies should include compensation to affected employees for all direct or foreseeable pecuniary harms suffered as a result of an unfair labor practice.

5.      Whether the NLRB erred in applying *Thryv* retroactively here.

6.      Whether the Board abused its discretion in denying the Union the extraordinary relief that it seeks.

## STATEMENT OF THE CASE

### A.      Background on Macy's and the Union.

Macy's is a large retail company that operates over 700 store locations in 43 states.  *See Macy's Inc.*, 372 NLRB No. 42 at *3, ER-5.  Local 39 represents a unit of building engineers and craftsmen that work at about 40 Macy's stores in Northern California and Reno, Nevada.  These associates perform maintenance of Macy's building operations, such as HVAC systems, electrical work, carpentry work, painting work, and repairs.  (1-SER-176; 2-SER-345).  The Union and Macy's have had a collective bargaining relationship for over 20 years.  (1-SER-175; 1-SER-83).  The parties' most recent CBA was effective from September 1,

5

2018, to August 31, 2020. (2-SER-344–71). At the time of its expiration, the CBA covered about 43 positions. (2-SER-368–69; 1-SER-84; 1-SER-175; 1-SER-177–78).

### B. The COVID-19 pandemic devastates Macy's business.

The parties began negotiating for a successor CBA a few months after the COVID-19 pandemic began. Macy's core business greatly suffered during the pandemic. Macy's first closed all its facilities nationwide in March. (1-SER-178–79). (All dates are 2020 unless stated otherwise.) At first, all Macy's employees, including Local 39 bargaining unit members, received two weeks of "disaster pay" after the closures. (1-SER-179). Macy's then furloughed most of its workforce, including most Local 39 members, in April. (1-SER-179). Macy's Northern California stores remained closed into the late spring, though some stores in the area did not open until later. For example, one of Macy's flagship stores, located at San Francisco's historic Union Square, did not reopen until June. (1-SER-214). Eventually, Macy's recalled about 43 Local 39 bargaining unit members by mid-August. (1-SER-179–80).

The pandemic had a significantly detrimental financial effect on Macy's in 2020. Macy's lost billions of dollars in revenue in 2020 alone, largely caused by the closures and decreased foot traffic once stores reopened. (1-SER-181–82).

///

6

### C. The parties fail to negotiate a successor CBA when the Union rejects Macy's LBF.

In July, the parties began negotiations for a successor CBA.  (1-SER-182–83).  Ashmore led Macy's negotiating team.  (1-SER-182).  At first, the Union's lead negotiator was Business Representative, Eddie Ramirez.  (1-SER-183).  District Representative Jay Vega assumed the role as the Union's lead negotiator in August.  (1-SER-183).

During July and August, the parties met for around a dozen bargaining sessions.  (1-SER-188).  The parties failed to reach a deal.  (1-SER-184–88).

On August 31, Macy's provided the Union with an LBF that, despite the pandemic's uncertainty, provided for 2.5 percent wage increases in each of the proposed new CBA's three years.  (2-SER-372–73).  On September 2, the Union presented the LBF to its membership for a vote, who rejected it.  (1-SER-85–88).

### D. The Union strikes and engages in serious misconduct, including conduct that Macy's reasonably perceives as sabotage.

On September 4, the Union started a strike against Macy's.  The Union also began picketing at Macy's Union Square location, which continued for the next three months.  (1-SER-89; 1-SER-98–99).  During the strike, the Union's members and their supporters regularly engaged in unprotected sabotage and illegal misconduct.  At the hearing before the ALJ, the Union did not dispute most of the

///

7

testimony of Macy's witnesses about the Union's inexcusable conduct. *See*, *e.g.*, (1-SER-219–65).

For example, during picketing Union members Diego Zarco and Greg Johnson directed homophobic slurs at two Macy's employees, Gilbert Saavedra and David Plew. (1-SER-144–45; 1-SER-147–52; 1-SER-269–70; 2-SER-299). These Engineers called Saavedra a "faggot manager" more than once. (1-SER-79–80). The Engineers similarly called Plew a "fag." (1-SER-144). They also made vulgar gestures towards Plew, including blowing kisses at him and thrusting their hips in Plew's direction with a bullhorn placed on their groin area. (1-SER-146). Plew was so distraught by this harassment, he complained about this conduct to his supervisors. (1-SER-271–74). Saavedra and Plew's characterizations of the bargaining unit employees' conduct was uncontroverted.

Union picketers also engaged in other problematic conduct during the strike, including: (1) shouting vulgar and demeaning insults at Macy's employees (1-SER-100; 1-SER-105; 1-SER-140–41); (2) attacking customers and employees with noise devices and picket signs (1-SER-128–32; 1-SER-103–04; 1-SER-266; 1-SER-267; 1-SER-268; 1-SER-133–39; 1-SER-74–78; 1-SER-102; 1-SER-275); and ignoring COVID-19 safety guidelines in the middle of a pandemic (1-SER-101–02; 1-SER-124; 1-SER-72–73; 1-SER-127).

Macy's also had serious concerns that the Union's members had engaged in

sabotage. In one incident, Macy's came to believe that union members stuffed refuse down a drainpipe in the sidewalk outside of Macy's, causing flooding at a restaurant on the premises of the Union Square Store where the Union was picketing. On September 23, Uhe received a report that sewage was flooding out of the Everbowl restaurant located near the O'Farrell Street entrance at the Union Square store. (1-SER-111). When Uhe arrived at the scene, he discovered foul-smelling "urine, toilet paper, and feces" pooling inside the restaurant and running across the sidewalk immediately outside. (1-SER-111). In response, Macy's placed an emergency work order and called a plumber and restoration company to assist with the sewage backup. (1-SER-111). Using a plumbing "snake" tool, the plumber unclogged the blockage – a t-shirt and a plastic bottle – from the sewage pipe located on O'Farrell Street that connected to the drainpipe located inside the Everbowl restaurant. (1-SER-113; 2-SER-278–98). The sewage backup caused extensive damage that cost Macy's several thousand dollars in interior and exterior cleaning costs, as well as the costs to replace unsalvageable food and utensils. (1-SER-114–15).

Uhe concluded the damage only could have been caused by someone intentionally stuffing the bottle and t-shirt down the drain based on his observation that the drainpipe opening was simply not large enough for the items to easily fall in by themselves. (1-SER-112–14; 1-SER-122–23). Uhe also immediately

recognized the clogged drainpipe was in the same area on O'Farrell Street that the Union had assumed as its customary "picketing spot." (1-SER-123).

The next day Uhe reviewed Macy's surveillance footage from the day that the sewage backup occurred to determine who stuffed the items down the drain. (1-SER-116). Uhe's investigation concluded that the unit employees in the video purposely caused the sewage backup. (1-SER-122–23). The footage revealed six Union members, at various points, either walking up to or standing near this drainpipe. The footage showed Local 39 Macy's employee Cliff Deuchar approaching the drainpipe with a picket sign and sticking the wooden handle of the picket sign directly down into the drain. (1-SER-119; 2-SER-277). The footage also depicted other Local 39 Macy's employees, including Greg Johnson, Fred Tinsley, and Eric Homen, looking down into the same drainpipe. (1-SER-117–18; 2-SER-277). In fact, the footage revealed Deuchar even flashing a cell phone flashlight down the drainpipe. (1-SER-120–21; 2-SER-277). During this same period, unit employees Ernesto Alvarez and Sal Castello also loitered near the drainpipe, expressing an unreasonable interest in the drainpipe. (1-SER-119). These Macy's bargaining unit employees had working knowledge of the drainpipe system running from the restaurant.

The Union tried to characterize the sewage backup as a mere run-of-the-mill maintenance issue, with one witness noting the restaurant space previously had

issues with sewage clogs at least twice a year. (1-SER-231). Yet in making this disingenuous assertion, the Union showed that Macy's bargaining unit employees in fact had knowledge that sewage drains near the restaurant were vulnerable to clogs and moreover, which drainpipe located on the street would cause a backup within the restaurant if clogged with refuse. Most importantly, neither Lybrand nor Vega denied having any knowledge or responsibility for causing the sewage backup at the Everbowl restaurant. (1-SER-219–65). The Union's rebuttal witnesses also could not explain why Union members were surrounding the drain conspicuously, loitering, and looking down the same drain the day before the sewage backup occurred. (1-SER-219–65; 2-SER-277).

Soon after the strike began, Macy's endured a series of atypical events at its facilities involving sabotage and flooding. As Uhe and Senior Director of Store Environment Alan Westenberger explained, some of these incidents occurred in areas of Macy's stores closed off from the public and seemed to result from purposeful sabotage that only bargaining unit employees would have known how to inflict. (1-SER-108–10; 1-SER-162–63; 1-SER-168–69). Macy's thus concluded that it was a strong possibility that the Union's members had committed sabotage. (1-SER-168–69; 1-SER-199). On top of the drainpipe incident, other suspicious incidents included: (1) a sink at the Union Square store not working because its electrical wires had been deliberately cut (2-SER-398–402);

(2) flooding caused by a stuffed floor drain at the Union Square Store (1-SER-106–210); (3) flooding caused by the clogging of a sump pump at another store (1-SER-155–61); and (4) flooding caused by tampering with an irrigation system at another location (1-SER-164–69).

### E. The parties continue discussions during the strike.

While the Union struck, the parties held no bargaining sessions, but lead negotiators checked in with each other every few weeks on the status of negotiations. (1-SER-189–90). During one conversation in September, Ashmore informed Vega that the LBF "would not be available forever and that at some point … it would expire." (1-SER-191). Vega responded that Union membership "never votes on the same deal twice." (1-SER-191).

On October 8, Ashmore informed Vega by telephone that Macy's LBF would expire in one week. (1-SER-192). Vega asked Ashmore to provide that statement in writing. (1-SER-192). A few days later, Ashmore emailed Vega to confirm that Macy's planned to hold the offer on the table until October 15. (2-SER-374–76). Ashmore sent this notice "in hope of rebuilding [the parties'] labor relations" even though Macy's had endured inexcusable conduct that "directly and negatively impacted our customers' experience and subsequently have become costly to our business and disruptive to our colleagues." (2-SER-374–76). The Union never responded and never sought more time to respond. (1-SER-193).

**F.    The Union makes a surprising "counteroffer" the day before Thanksgiving.**

On November 25, Vega sent an unexpected email to Ashmore containing a "counteroffer" to Macy's LBF.  (2-SER-377–80; 1-SER-194–96).  Ashmore was surprised at the offer, as she considered bargaining proposals such as this one to be particularly "apt" for discussion "at the negotiations table."  (1-SER-196).  Also surprising was the timing of the email, as it arrived the Wednesday afternoon before Thanksgiving.  (1-SER-194–95).  Like many, Ashmore was not working that afternoon and had no plans to work over the four-day holiday weekend.  (1-SER-194–95).  Even so, Ashmore texted Vega that same day to confirm receipt of his email.  She also explained that she was out of the office and would be unable to discuss the counter with her team until after Thanksgiving.  (2-SER-403).  Following the holiday weekend, Ashmore met with her negotiations team and leadership about the Union's proposal.  (1-SER-197).

**G.    On December 4, Macy's rejects the Union's counteroffer, and the Union restates its rejection of Macy's LBF and unexpectedly offers to return to work.**

On Friday, December 4, Ashmore rejected the Union's counteroffer.  Ashmore considered the counteroffer to be a non-starter because it would have delegated to the Union unfettered discretion over the allocation of economic increases between wages and pension benefits for bargaining unit members.  (2-SER-381; 1-SER-197).  Macy's could not agree to this proposal because it could

13

not effectively budget for such contingencies.  (1-SER-197).

Later that same day, Vega replied to Ashmore's rejection of the Union's counteroffer.  In that email, he reiterated that the Union's members had "rejected Macy's last and best offer" and therefore the Union was "unwilling to agree to and/or sign the [LBF]."  (2-SER-382).  Vega then explained that the Union was making "an unconditional offer to return our members to work immediately, regardless of the outcome of the Court matter."  *Id.*[1]

Ashmore needed more time to discuss the Union's return to work offer with Macy's management.  During the strike, Macy's used vendors to complete maintenance work.  (1-SER-200).  Ashmore thus needed to determine whether temporary contractual arrangements with vendors would impede an immediate return.  (1-SER-200).  Ashmore replied to Vega that she needed time to discuss with her business partners and would provide a substantive response by the end of the next business day (i.e., Monday, December 7).  (2-SER-383).

In response, on December 4 Vega asked if the company was locking out the Union's members.  (2-SER-384).  The next day, Ashmore denied that was the case for the moment, explaining that the Union's "unexpected offer," coming after a

---

[1] Ashmore understood Vega's reference to the "Court matter" to mean state court proceedings that Macy's had filed against the Union over its misconduct during the strike.  In fact, Ashmore considered the Union's offer to be "an attempt for the Union to try to sway the decision" at a court hearing taking place that same day. (1-SER-198).

three-month strike, implicated "several administrative, logistical, and economic issues that need to be fully evaluated on our end with the input of several company employees." (2-SER-385). Ashmore therefore asked Vega to give the company the courtesy of being able to evaluate the offer until the close of business Monday before providing a response. (2-SER-385; 1-SER-201–02). Vega refused to grant Ashmore that courtesy, replying Sunday evening, December 6, that the Union's members would report to work at their stores on Monday, December 7, even though Macy's had asked them not to appear. (2-SER-386). Ashmore replied that Macy's had not yet decided on a lockout, but that stores would not be ready for unit members to return. She therefore renewed her request that Vega convey this information to the Union's members. (2-SER-387).

### H. On Monday, December 7, some Union members return to work without authorization and engage in further misconduct that Macy's reasonably perceives as sabotage.

Some, but not all, bargaining unit employees reported to work on December 7. (1-SER-203–04). They did not, however, report in an organized and expected manner or report to their regular "home stores" (which was why Macy's was concerned about their return without an agreement in the first place). (1-SER-204). And even though the employees had not worked in three months, those who reported to work simply clocked in without speaking with store management. (1-SER-205–06).

Macy's management received reports of sabotage at a location. Some bargaining unit employees reported to work at various stores, including the Southland Store. (1-SER-170). After about an hour, Macy's instructed these employees to leave because Macy's had not agreed to return them to work. (1-SER-170). Shortly after the bargaining unit employees left, Macy's discovered that they had tampered with the locks to the Engineer's office at the Southland Store, thus preventing Macy's other staff from gaining access. (1-SER-170). Macy's concluded that the Engineers changed the locks during the time they were at work on December 7 in an effort to lock out management from the office, as they had access to the tools, motive, and opportunity to change the locks. As a result, Macy's had to replace the locks to gain access to the office at this location as well. (1-SER-170).

**I.      Macy's informs the Union its members are locked out until there is an agreement in place.**

On December 7, Ashmore met with Macy's labor team and leadership to discuss the bargaining unit members' possible return to work. The meeting's attendees included Ashmore, her supervisor Chanell Bracey-Davis, Alan Westenberger, Bill Erbacher, and John Bienes.[2] (1-SER-215–16). During this meeting Macy's business team collectively decided to reject the Union's return to

///

---

[2] Macy's outside counsel also participated in this meeting. (1-SER-215-16).

work demand and, instead, to lock out the bargaining unit employees. (1-SER-216).

There were two primary reasons for the lockout. (1-SER-171). It is undisputed that there is no evidence of antiunion animus. Rather, the first reason was to place economic pressure on the Union to return "back to the … bargaining table and ... ultimately get to a fair and reasonable contract for both parties." (1-SER-171; 1-SER-207 (Ashmore explains that Macy's sought to exert "economic leverage" on the Union)).

Second, as detailed above, Macy's had grave concerns that bargaining unit employees who returned without a contract could cause further havoc and disruption by either walking off the job during the holiday season or sabotaging building operations systems and equipment. (1-SER-171; 1-SER-208 (Ashmore likewise was concerned about Union misconduct and business disruption)).

After Macy's decided to lock out the unit members, Ashmore emailed Vega:

> We have carefully evaluated your offer to have bargaining unit members return to work. We are not willing to reinstate bargaining unit employees until there is an agreement in place; this decision is being made in support of our bargaining position.

> We are available for bargaining sessions on Thursday 12/10, Friday, 12/11, Thursday 12/17, and Friday 12/18, from 9:00AM- 11:00AM PST.

(2-SER-388). While Macy's had elected to lockout bargaining unit employees, it still hoped to reach an agreement as soon as possible, which is why Ashmore

provided bargaining dates in the same email. (1-SER-209). Vega never sought

clarification from Ashmore on what offer Macy's currently had on the table or

what conditions needed to be satisfied to end the lockout. (1-SER-209). Rather,

the Union simply responded that it was available to bargain on all but one of the

dates proposed by Macy's. (2-SER-389).

### J.      Macy's makes a new offer three days into the lockout.

On December 10, three days after Ashmore's December 7 email, the parties

met for their first bargaining session in more than three months. (1-SER-210).

Macy's engaged in good-faith bargaining during this session by providing the

Union with a bargaining proposal. (2-SER-390–91; 1-SER-210). Ashmore

considered it important to provide this offer during a bargaining session and

conveyed this sentiment across the table to the Union:

> [Macy's was] about to put in a counteroffer across the table that was
> less than the last, best, and final offer, and we wanted to explain the
> Company's business position and how circumstances have changed
> over the last few months, that business was not going in the direction
> that we had hoped at the time, and that we were -- wanted to be
> prudent about our position on the table.

(1-SER-211–12). Even though Macy's had endured a three-month strike, the

December 10 offer still provided for 1.75 percent wage increases each year of the

contract, pension contribution increases of between 3 and 4.3 percent, and a

substantial investment in Macy's health care contributions. (2-SER-390–01).

The Union rejected Macy's December 10 offer and provided its own

counteroffer that same day. (1-SER-212; 2-SER-392–93). The parties met the next day and again exchanged bargaining proposals. (1-SER-213; 2-SER-394–97). The parties also met on December 17. *Id.* The parties did not agree on a new contract. (1-SER-213).

### K. Procedural Background

On December 9, the Union filed an unfair labor practice charge against Macy's. (2-SER-301). Two months later, the Union filed a First Amended Charge. (2-SER-303). In February 2021, the General Counsel issued a Complaint and Notice of Hearing ("Complaint") alleging that Macy's had violated Sections 8(a)(1) and (3) of the Act by locking out the bargaining unit employees and refusing to reinstate them. (2-SER-305–13). The Complaint contained a "Remedies" section in which the General Counsel sought an Order requiring reinstatement and a make whole remedy for any lost wages.

An ALJ conducted a six-day hearing in June 2021 by video conference. *Macy's Inc.*, 372 NLRB No. 42 at *3; ER-5. At the hearing, exhibits were introduced into evidence and testimony was taken. After the hearing concluded and the parties filed post-hearing briefs, the ALJ issued a decision in April 2022 finding that Macy's violated the Act by locking out the Union's members. *Id.* at *3-24; ER-5–26. The ALJ concluded that, although Macy's locked out employees to bring economic pressure on the Union, Macy's violated the Act because it

locked out employees without any open bargaining proposals on the table. *Id.* at *20; ER-22. The ALJ also largely rejected Macy's contention that concerns about possible sabotage also motivated Macy's decision to commence the lockout.

Macy's filed exceptions to the ALJ's decision, which were opposed by the General Counsel and the Union. (1-SER-2-10). The Union also filed cross-exceptions to the ALJ's decision, seeking various extraordinary remedies that had not been contemplated at any point before or during the hearing. (ER-27-31). On January 17, 2023, the Board summarily affirmed the ALJ's decision in all substantive respects. *Macy's Inc.*, 372 NLRB No. 42 at *1-2; ER-3–4.

As described above, Macy's then timely petitioned for review in the Fifth Circuit. The Union then filed an invalid petition for review in this Court. The Judicial Panel on Multidistrict Litigation consolidated the two cases pursuant to 28 U.S.C. § 2112(a)(3), randomly selecting this Circuit as the one in which consolidation would occur. The NLRB filed applications for enforcement against both petitions for review. This Court has now consolidated all proceedings.

Macy's moved to dismiss the Union's petition for review. Docket Entry No. 13 in Case No. 23-124. The Court denied that motion "without prejudice to renewing the arguments in the merits briefing." Docket Entry 23 in Case No. 23-124.

///

20

## SUMMARY OF ARGUMENT

I.      The Court lacks jurisdiction because the Union is not a person aggrieved under the Act.

Under the Act, only a person aggrieved by a Board order may petition for review to a circuit court. 29 U.S.C. § 160(f). Under this Court's precedent, a party is not a "person aggrieved" under Section 10(f) if the Board's decision "granted it all of the relief that it had specifically sought in the charge form and complaint." *Int'l Union of Operating Eng'rs Local 501 v. NLRB*, 949 F.3d 477, 482 (9th Cir. 2020). The Union cannot fabricate jurisdiction by seeking extraordinary remedies for the first time in its cross exceptions that the Board perfunctorily declines to order. The Court should dismiss the Union's petition and transfer the remaining proceedings to the Fifth Circuit.

II.     The Board erred in holding Macy's lockout violated the Act.

A.      The Court should remand for the Board to apply binding Supreme Court precedent. When, as here, an employer acts without antiunion animus, the Board may find a violation of Section 8(a)(3) of the Act only if the employer's actions are "inherently destructive of important employee rights" and finding a violation strikes the right balance between the asserted business justifications and the invasion of employee rights considering the Act and its policy. *Great Dane*, 388 U.S. at 33. Yet the Board failed to cite or apply this binding caselaw. This Court should remand for the Board to do so.

B.     If this Court excuses the Board's failure to follow the law and engages in the requisite analysis for the first time on appeal, it should hold that Macy's permissibly imposed an offensive lockout.  Under Board precedent, Macy's permissibly explained that, as part of its legitimate bargaining objectives, it would not reinstate the bargaining unit until the parties reached an agreement.  Because the Union's demand to return to work accompanied a restatement of its rejection of Macy's LBF, it would have been a pointless act for Macy's to reinstate its LBF when it imposed the lockout.

C.     Contrary to the Board's holding, Macy's lockout was also permissible for defensive reasons.  Macy's reasonably feared that bargaining unit members would continue a campaign of sabotage and further strikes absent a new contract.

D.     Contrary to the Board's holding, Macy's cured any violation within three days of the lockout's start when it made a full offer over the bargaining table.

III.    The Board erred in applying its recent decision in *Thryv* here.

A.     *Thryv* was wrong.  The Board lacks statutory authority to award "direct or foreseeable" pecuniary losses as damages.

B.     The Board abused its discretion in applying *Thryv* retroactively.  The Board applies new rules prospectively when retroactive application would cause "manifest injustice."  *SNE Enterprises*, 344 NLRB 673 (2005).  That is the case

///

22

here given Macy's reliance on preexisting law and the injustice arising from retroactive application.

IV.    The NLRB permissibly rejected the Union's requests for extraordinary remedies.

The Court should reject the Union's request for extraordinary remedies. The Board permissibly concluded that its traditional remedies sufficiently remedied any supposed violation given that this single lockout event is not part of a pattern of egregious misconduct by Macy's against the Union.

## STANDARD OF REVIEW

This Court reviews de novo "whether the Board applied the correct legal standard." *NLRB v. Bingham-Willamette Co.*, 857 F.2d 661, 663 (9th Cir. 1988). The Board's interpretation of the Act warrants deference if "rational and consistent" with the statute. *NLRB v. Calkins*, 187 F.3d 1080, 1085 (9th Cir. 1999). In other words, this Court defers to any "reasonably defensible interpretation of the Act." *Local 501*, 949 F.3d at 479 (cleaned up). The Board's decision should be upheld only if "its findings of fact are supported by substantial evidence and it correctly applied the law." *Int'l All. of Theatrical Stage Emps., Loc. 15 v. NLRB*, 957 F.3d 1006, 1013 (9th Cir. 2020). Because the Board is vested with "broad discretion in devising remedies," this Court reviews the Board's remedial orders for a "clear abuse of discretion." *Local Joint Exec. Bd. of Las Vegas v. NLRB*, 883 F.3d 1129, 1134 (9th Cir. 2018) (citations omitted).

23

## ARGUMENT

**I.     The Court lacks jurisdiction because the Union is not a person aggrieved under Section 160(f).**

Under the Act, a "person aggrieved" by a Board order "granting or denying in whole or in part the relief sought" may petition for review in any circuit in which it transacts business.  29 U.S.C. § 160(f).  The Union asserts in its Statement of Jurisdiction that it is a "person aggrieved" under the Act because it "asked for additional remedies that the Board considered and denied in footnote 2 of the Board's decision."  Union AOB at 2.  That statement is unsupported by any pertinent caselaw.  And the Union provides no support for its position other than to point to decisions in which the Board itself has ordered additional remedies in reviewing an ALJ's decision.

The Union's Opening Brief puts the cart before the horse.  The Union is not a "person aggrieved" under the Act.  The Union prevailed below.  If the Union merely wants to "sustain the administrative order" then it lacks standing to petition for review under Section 10(f).  *Amalgamated Meat Cutters v. NLRB*, 267 F.2d 169, 170 (1st Cir. 1959); *Standard Drywall, Inc. v. NLRB*, 547 F. App'x 809, 811 (9th Cir. 2013).  A party may petition for review of the Board order only if it has suffered an "adverse effect in fact." *Liquor Salesmen's Union Local 2 v. NLRB*, 664 F.2d 1200, 1206 n.8 (D.C. Cir. 1981) (internal quotations omitted).  The Board's denial of the Union's request for extraordinary remedies, not raised until

after a full hearing, belatedly for the first time in its cross exceptions does not satisfy this requirement.

This Court has made clear that a party is not a "person aggrieved" under Section 10(f) if the Board's decision "granted it all of the relief that it had specifically sought *in the charge form and complaint*." *Local 501*, 949 F.3d at 482 (emphasis added). That the Board declines to "impose an affirmative remedy" sought by the Union does not make the Union aggrieved by the Board's decision. *Id.*; *see also SEIU United Health Workers-West v. NLRB*, No. 15-71671, 2015 U.S. App. LEXIS 16933, at *1 (9th Cir. July 28, 2015) (dismissing union petition for review because it was not an "aggrieved party" and therefore lacked standing to bring the petition).

Here, neither the Union's Charges nor the General Counsel's Complaint seek the extraordinary remedies that the Union belatedly raised in haphazard cross-exceptions to the ALJ's decision. (2-SER-301; 2-SER-303; 2-SER-305–13). Indeed, the Union never identified any relief sought in the Charge or the Amended Charge. (2-SER-301; 2-SER-303). The General Counsel's Complaint, on the other hand, identified specific remedies sought on the Union's behalf, including reinstatement and to make the Union's members whole for their loss of earnings and other benefits. (2-SER-305–13). In turn, the Board's decision and order granted all the relief sought in the Complaint. The Board ordered Macy's to offer

full reinstatement, to make locked-out employees whole for any loss of earnings and other benefits, and to make a notice posting at all facilities where unit members worked. *See Macy's Inc.*, 372 NLRB No. 42, at *1-2; ER-3–4. Thus, since the Union prevailed on all claims and obtained all the relief sought in the Charges and the Complaint, it is not aggrieved. *Local 501*, 949 F.3d at 482.

The Union transparently attempted to improperly infringe on Macy's statutory right as the truly aggrieved party in a Board proceeding to choose its appellate forum of choice. The Union's motive is apparent. Macy's chose to litigate its appeal of the Board's decision in the Fifth Circuit. The Union filed its own petition for review here in the Ninth Circuit to subvert Macy's statutory right provided by Congress. Regrettably, the Union's cynical attempt succeeded, as the Union prevailed in a random selection scenario, and the case was consolidated in this Circuit. 28 U.S.C. § 2112(a)(1) & (3). Now, this case is proceeding here after the Court initially denied without prejudice Macy's motion to dismiss the Union's petition for review.

If the Board's denial of the Union's cross-exceptions were to satisfy the aggrievement requirement of Section 10(f) it would create an unworkable standard. Yet this Court has held that statutes "should never be construed as establishing statutory schemes that are illogical, unjust, or capricious." *Bechtel Constr., Inc. v. United Bd. of Carpenters & Joiners*, 812 F.2d 1220, 1225 (9th Cir.1987). But any

standard that finds standing here would, in practice, allow *any* party in a Board proceeding, even if it prevails on all claims and obtains all pleaded relief, to petition for review of any Order simply by requesting unreasonable extraordinary relief in an exception. Under this theory, *any prevailing* party could be a party "aggrieved." Nothing could stop an individual awarded the Board's traditional remedies of back pay and reinstatement from arguing that the employer must do some other obsequious act to placate him. It matters not whether the relief sought is reasonable or whether Board law supports such damages. All that matters is that the party can claim to have not received everything that it wanted from the Board's order.

This Court's binding precedent has already rejected such an expansive reading of Section 10(f). Under *Local 501*, a party that obtains all the relief that it seeks in the charge and the Complaint cannot claim aggrievement when it seeks additional remedies. The Court should therefore dismiss the Union's petition and transfer the remaining proceedings to the Fifth Circuit.

## II. The Board erred in holding that Macy's unlawfully locked out the Union's members.

The Board erred in affirming, with no substantive analysis, the ALJ's conclusion that Macy's unlawfully locked out the bargaining unit. That decision was wrong because it was not "rational and consistent" with the Act. *See Calkins*, 187 F.3d at 1085. For the reasons discussed below it was not a "reasonably

27

defensible" evaluation of Macy's lockout. *Local 501*, 949 F.3d at 479.

### A. The Board failed to follow Supreme Court precedent in evaluating Macy's lockout, requiring reversal.

The Board found Macy's violated Section 8(a)(3) of the Act. That Section makes it an unfair labor practice for an employer "by discrimination in regard to … any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). The Supreme Court has held, "time and again, that a violation of Section 8(a)(3) normally turns on an employer's antiunion purpose or motive." *800 River Rd. Operating Co. v. NLRB*, 784 F.3d 902, 908 (3d Cir. 2015); *see NLRB v. Brown*, 380 U.S. 278, 287 (1965) ("We have determined that the 'real motive' of the employer in an alleged § 8(a)(3) violation is decisive….") (citation omitted); *Great Dane*, 388 U.S. at 33 ("The statutory language 'discrimination … to … discourage' means that the finding of a violation normally turns on whether the discriminatory conduct was motivated by an antiunion purpose.") (citation omitted).

The ALJ did not find that Macy's acted with antiunion motivation. Neither did the Board. So the Board's finding of an 8(a)(3) violation cannot be upheld on that basis. But admittedly that is not the end of the Section 8(a)(3) inquiry because the Supreme Court has held that proof of an improper antiunion motive is sometimes unnecessary. *See Great Dane*, 388 U.S. at 33-34.

Under the *Great Dane* framework, the Board first must determine whether

28

an employer has engaged in conduct "inherently destructive of important employee rights." *Great Dane*, 388 U.S. at 34. Inherently destructive actions can include those that harm the collective bargaining process, interfere with employees' right to strike, or are taken against employees because of their union status. *See Local 15, Int'l Bhd Elec. Workers v. NLRB*, 429 F.3d 651, 656 (7th Cir. 2006) (citing *Esmark, Inc. v. NLRB*, 887 F.2d 739, 748 (7th Cir. 1989)). For an action to be "inherently destructive" the effect on the collective bargaining process "must be more than temporary; it must instead establish a barrier to future collective bargaining." *Id.* This Court has explained that "inherently destructive" conduct has "far reaching effects which would hinder future bargaining, or … discriminates solely upon the basis of participation in strikes or union activity." *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976).

If the Board finds the employer's conduct to be inherently destructive of important employee rights, then the Board may presume an unlawful motive. *Great Dane*, 388 U.S. at 34. The employer may provide "counter explanations" for its conduct, but the Board may still find an unfair labor practice if doing so will "strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." *Id.* at 33-34.

Second, if the Board does not find that the conduct is "inherently destructive," but that the conduct has only a "comparatively slight" impact on

29

employee rights, then the burden shifts to the employer to "come forward with evidence of legitimate and substantial business justifications for the conduct." *Id.* at 34. If the employer does not, then the Board can find a violation of the Act. But if the employer does so, then the burden shifts back to the Board to present "specific evidence" of the employer's intent to discourage Union membership. *Id.* In other words, the only circumstance in which the Board need not establish antiunion motivation for a violation of the Act is when it makes a specific showing that the conduct alleged to be unlawful is inherently destructive of employee rights.

The Board's failure to evaluate a Section 8(a)(3) violation under this framework is reason alone to deny enforcement. *See 800 River Road*, 784 F.3d at 908-910. In *800 River Road*, the Third Circuit reviewed a Board decision that found an employer had violated the Act by withholding benefits from employees eligible to vote in an upcoming union election. The Board found that the employer violated the Act because it did not comply with a "safe harbor" procedure developed by the Board for notifying employees about the postponement of benefits adjustments during an election campaign. *Id.* at 908.

The court rejected the Board's analysis. It first gave a thorough overview of *Great Dane* and the Supreme Court's Section 8(a)(3) jurisprudence, then explained that "[w]e are at a loss as to why the Board's operative test … failed to address any of these issues." *Id.* at 910. The court explained that the Board's "failure to make

a finding as to the nature of the effect on employee rights" simply could not be "reconciled with what the Supreme Court has instructed the ALJ and the Board to do." *Id.* Because the court disapproved of the Board's reasoning, it remanded the case to the Board so that the Board could modify its faulty "mode of analysis … to comply with the Supreme Court's equally longstanding precedent to the contrary." *Id.*

This Court should similarly decline to enforce the Board's Order because it derived from the wrong "mode of analysis." Like the Third Circuit, this Court should also be "at a loss" as to why the Board addressed none of the relevant Section 8(a)(3) factors. Both the ALJ and the Board completely disregarded the Supreme Court's *Great Dane* framework in finding Macy's violated Section 8(a)(3). Even though that binding precedent has been the standard for evaluating Section 8(a)(3) violations, including lockouts, for over half a century, the Board's decision does not cite *Great Dane*. That is the case even though Macy's argued the *Great Dane* issue in its Exceptions to the Board and its brief in support of those Exceptions. (1-SER-4; 1-SER-50–52). The Board does not find that Macy's exhibited antiunion animus. It does not even mention the phrase "inherently destructive," much less find that Macy's engaged in actions that rose to that level. At a minimum, then, this Court should remand this case to the Board so that it can follow binding Supreme Court precedent.

31

That said, if the Court excuses the Board's failure and engages in the required *Great Dane* analysis for the first time on appeal, it should conclude that Macy's did not violate the Act for the reasons discussed below.

### B. Macy's did not engage in conduct "inherently destructive of important employee rights" when it started an offensive lockout.

The key facts are undisputed. As laid out above, the Union offered for the bargaining unit to return to work after a three-month strike. Macy's declined the offer and explained that it was locking out the bargaining unit in support of its position that it needed an agreement in place before returning employees to work. If Macy's had had an offer on the table at that moment, then there would be no serious dispute that Macy's acted lawfully. In fact, the ALJ accepted that Macy's "motive" for the lockout was to "gain economic leverage." *See Macy's Inc.*, 372 NLRB No. 42 at *22; ER-24. And the Board has long held that "urging consideration and acceptance of one's bargaining proposals is clearly a legitimate bargaining position, and we find that application of economic pressure in support of this bargaining position constitutes a legitimate and substantial business justification for the lockout within the meaning of *Great Dane*." *Central Illinois Public Service Co.*, 326 NLRB 928, 932 (1998). Circuit courts concur with this analysis. *See*, *e.g.*, *Teamsters Local 455 v. NLRB*, 765 F.3d 1198, 1202 (10th Cir. 2014) (Gorsuch, J.) ("The Supreme Court has long instructed that an employer

may, consistent with the [Act], lock out employees during collective bargaining negotiations to 'bring[] economic pressure to bear in support of [its] legitimate bargaining position.") (citing *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318 (1965). Indeed, Justice Gorsuch found while on the Tenth Circuit that there is "no way" to "permissibly overturn such long-settled precedent." *Id.*

At the precise moment that Macy's instituted its lockout it did not technically have an open offer on the table because it had withdrawn the LBF offer while the Union was on strike, after the Union's membership rejected it. The ALJ found this violated the Act, and the Board concurred without discussion, because in his view this meant that the Union was not "informed on a timely basis" of the employer's demands. *See Macy's Inc.*, 372 NLRB No. 42 at 20; ER-22 (citing *Alden Leeds, Inc.*, 357 NLRB 84, 93 (2011), enfd. 812 F.3d 159 (D.C. Cir. 2018) and *Dayton Newspapers*, 339 NLRB 650, 656 (2003), enfd. in relevant part 402 F.3d 651 (6th Cir. 2005)). That finding is erroneous. The lockout was not "inherently destructive of important employee rights."

***First***, the ALJ's finding contradicts *Eads Transfer*, 989 F.2d 373, 377 (9th Cir. 1993) (enforcing 304 NLRB 711 (1991)), which held that a lockout is not inherently destructive when, as here, the employer clearly notifies the union of the lockout so that the employees may "reevaluate[] their positions and take[] appropriate actions in reaching a new bargaining agreement." *Id.* at 377.

33

Macy's followed *Eads Transfer's* guidance by promptly informing the Union of its lockout on December 7, the first business day after the Union offered to return to work after a three-month strike. Macy's locked out the Union's members "in support of its bargaining position." *Eads Transfer*, 304 NLRB at 712. Ashmore explained to Vega, in language that closely tracked that approved by this Court in *Eads Transfer*, that Macy's was "not willing to reinstate bargaining unit employees until there is an agreement in place. This decision is being made in support of our bargaining position." (2-SER-388). Plainly that "bargaining position," that Macy's needed a contract in place before reinstatement, is similar if not identical to the bargaining position the Board endorsed in *Eads Transfer*. The Board has never explained how particularized an offer must be to satisfy its precedent. That is because there is no such requirement – the statement that an agreement must be in place for employees to be reinstated is sufficient.

The Board's decision fails to recognize this Court's guidance in *Eads Transfer* that *the Union* needs to take appropriate actions following the declaration of a lockout. *Eads Transfer*, 989 F.2d at 377. If the Union had questions about Macy's position, such as believing that it needed more details on how to facilitate a return to work, then it certainly could have asked. The lines of communication between Vega and Ashmore were open during this period. Instead, the Union sat on its hands.

34

Thus, the ALJ's finding that the lockout violated the Act because Macy's did not technically have a full offer on the table contradicts *Eads Transfer*.

**Second**, the ALJ's finding contradicts two other Board precedents. In *Ancor Concepts, Inc.*, 323 NLRB 742 (1997) the Board held that the employer engaged in a lawful lockout by notifying the union that "it would not offer the strikers reinstatement until a new agreement was reached" because that "was sufficient to inform the striking employees that the employer was locking them out in support of its bargaining position." *Id.* at 744. Similarly, in *Field Bridge Associates*, 306 NLRB 322, 330 (1992), the Board found an employer engaged in a lawful lockout by notifying the union that it would not offer reinstatement "until such time a union agreement has been reached."

The ALJ did not even address these Board precedents, much less explain how they could permit him to find Macy's lockout violated the Act. That constitutes reversible error. As Chief Justice Roberts explained while on the D.C. Circuit, "the Board has an obligation to engage in reasoned decisionmaking, which … requires it to give a reasoned explanation when it departs from its own precedent." *Lemoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 60 (D.C. Cir. 2004) (citing *Int'l Union of Operating Eng'rs v. NLRB*, 294 F.3d 186, 188 (D.C. Cir. 2002)). The Board failed to do so here.

**Third**, the two decisions on which the ALJ relied, *Alden Leeds* and *Dayton*

35

*Newspapers*, are wrongly decided and distinguishable. They are wrongly decided because, like the ALJ below, they failed to evaluate the employer's actions under *Great Dane*. No court or Board decision has ever held that it is inherently destructive of employee rights to start a lockout just because there is no full offer on the table.

*Alden Leeds* is distinguishable because, unlike here, the ALJ in that case found the employer improperly implemented a lockout because it made an "uncertain, ambiguous, and confusing" offer. 357 NLRB at 95. The ALJ thus concluded that the employer had presented the union with a "moving target" that provided no "clear statement" on how to end the lockout. *Id.* By contrast, Macy's concisely laid out from the beginning its bargaining position that it needed a contract in place before returning bargaining unit employees back to work. *Dayton Newspapers* also is distinguishable because there the employer had presented "unclear and changing conditions" that became a "moving target." 339 NLRB at 656. Here, in contrast, Macy's first provided the Union with its demand that a contract be in place before reinstatement. At that exact same time, it sought to reengage the Union in bargaining, then provided a specific bargaining proposal less than three full days later.

Both cases are distinguishable too because in each case it would not have been a pointless act for the employer to renew its LBF. Here, when the Union

made a return to work offer, it restated its rejection of Macy's LBF. (2-SER-382). Macy's then informed the Union of the lockout. (2-SER-388). Thus, it would have been a pointless and superfluous act for Macy's to renew its LBF when it started the lockout. Under these circumstances, the ALJ's finding that Macy's violated the Act simply because its LBF was not technically on the table when it started the lockout is an illogical interpretation of the Act, something this Court should not countenance. *See In re Board Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1223 (9th Cir. 2019) (rejecting interpretation of statute that "makes no practical sense"); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007-08 (9th Cir. 2006) (observing that "statutory interpretations which would produce absurd results are to be avoided.").

*Fourth*, the Board's conclusion is unreasonable because it finds a Section 8(a)(3) violation even though Macy's actions had only a temporary effect on bargaining. As the Seventh Circuit has explained, only conduct that imposes a "more than temporary" effect on the collective bargaining process is inherently destructive. *See Local 15*, 429 F.3d at 656. Macy's conduct here was plainly temporary with only a temporary impact. Macy's locked out bargaining unit

37

employees Monday evening on December 7. Yet that did not establish any "barrier to future collective bargaining." *Id.* Macy's and the Union met for a bargaining session Thursday morning (as in three days later). Macy's presented a revised offer to the Union at that time. As a result, the Union knew it was locked out as of December 7 and, under *Eads Transfer*, knew that it needed to take "appropriate actions" to reach a new bargaining agreement. 989 F.2d at 377. And that is exactly what happened. At worst then the Union knew *exactly* how to end the lockout less than three days after Macy's started the lockout. The Board's suggestion that Macy's conduct somehow had a "more than temporary" effect on bargaining is pure sophistry that ignores the facts here.

**Fifth**, the Board irrationally ignored a contrary opinion letter directly on point.[3] In *Meridian Automotive Sys.*, 2007 NLRB GCM LEXIS 1, Case No. 9-CA-42952 (Jan. 16, 2007), the Board's General Counsel's Division of Advice declined to issue a complaint against an employer that had implemented a lockout *after* withdrawing a final bargaining proposal. In that matter, the employer provided the union with a "final offer" after several unsuccessful bargaining sessions. The employer later informed the union that it planned to withdraw the final offer,

---

[3] Macy's recognizes that advice memoranda from the Board's General Counsel "do not constitute precedential authority and are not binding on the Board." *NLRB v. Pier Sixty, LLC*, 855 F.3d 115, 123 n.36 (2d Cir. 2017). Even so, that the Board reached a conclusion here that directly contradicts a prior advice memorandum *directly on point* suggests that the Board acted irrationally.

setting a deadline within a few days.  When that deadline expired, the employer

emailed the union to not only criticize the lack of progress in bargaining, but also

to inform the union that it planned to continue operations without unit employees

until the parties agreed on a new contract.  *See id.* at *1-2.

The Division of Advice concluded that a complaint against the employer

should *not* issue.  In doing so, it explained that the employer had "notified the

Union and its employees that it was locking them out *until a new agreement was*

*reached*."  *Id.* at *6 (emphasis added).  Based solely on this fact, the Advice

Memorandum concluded that the employer "adequately informed the Union and

the employees of the conditions needed to end the lockout."  *Id.*

*Meridian Automotive* is indistinguishable from this case.  While

nonprecedential, the Advice Memorandum is helpful guidance here that should be

given "respect" because it has the "power to persuade."  *See Christensen v. Harris*

*Cnty.*, 529 U.S. 576, 587 (2000) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140

(1944)).  In particular, *Meridian Automotive* rejects the Board's theory that *Dayton*

*Newspapers* articulates a bright-line rule that the full contents of an offer must be

officially on the table at the time of a lockout.  *Meridian Automotive* came after

*Dayton Newspapers*.  It evaluated the employer's conduct there under *Eads*

*Transfer* and *Dayton Newspapers*.  The Board's General Counsel saw no violation.

The Board should not have found one here either.

*Sixth*, even if the ALJ were free to create an unprecedented rule that Macy's had to provide a full offer timely (however that could be qualitatively/quantitatively determined) for the lockout to be valid, the ALJ should have found that Macy's satisfied that requirement. Macy's primary negotiator, Ashmore, decided that the most courteous practice would be to provide the Union with Macy's next bargaining proposal through formal bargaining. She made that decision fully aware that the Union had rejected the LBF just a couple of days earlier. She therefore considered it important to present that next proposal "across the table" because it would be regressive from the August LBF. (1-SER-211–12). That reduced offer resulted from Macy's business circumstances, including a substantial loss of revenue in the last half of 2020. *Id.*

Macy's communicated that offer less than three days later during a bargaining session scheduled by the parties. Macy's thus timely communicated its bargaining position to the Union during negotiations. The Act does not, and should not, bar an employer from taking time to formulate the full contents of a lockout-related offer, even if that leads to a minor delay in communicating that offer.

For all the above reasons, if the Court performs the *Great Dane* analysis that the Board was required to perform but did not, it should hold that Macy's lockout was not inherently destructive of union rights. As a result, the Board's finding of a Section 8(a)(3) violation was improper.

### C. Macy's did not engage in conduct "inherently destructive of important employee rights" when it started a defensive lockout; even if it did, finding a violation of the Act would not strike the proper balance.

As discussed above, Macy's also had significant concerns about the Union's actions, which caused it to conclude that it needed a new CBA in place before returning bargaining unit members. Those concerns arose from the Union's conduct during the strike, including using homophobic slurs against team members, sabotaging a drain pipe, and changing the locks to the engineer's offices.

Macy's two witnesses involved in the lockout decision consistently testified about their decisionmaking process, including an uncontradicted description of a group meeting concerning whether the Company should begin the lockout the ensuing business day after the Union made its return-to-work offer. Both Westenberger and Ashmore credibly testified about the reasons that they believed a lockout was appropriate at that time, both mainly relying on the economic rationale and secondarily on the concerns about misconduct, with both explaining that those concerns about Union sabotage and misconduct were particularly pressing during the holiday shopping season. (1-SER-171–72; 1-SER-207–08).[4]

_____

[4] The ALJ's theory, adopted without comment by the Board, that Macy's invented non-economic reasons for the lockout afterward also makes no sense. Macy's defense at the hearing would have been much simpler if the Company's lockout had been implemented solely to exert economic pressure, in part because the ALJ accepted that rationale. *See Macy's Inc.*, 372 NLRB No. 42 at 22; ER-24 ("I find that Respondent's motive for the December 7 lockout was to gain economic lever-

The ALJ largely rejected the testimony of these two witnesses. While he accepted their testimony that Macy's locked out the Union in support of its bargaining position, he rejected the assertion that there were also concerns about Union misconduct during the holiday shopping season if the employees returned without a contract. Yet no evidence contradicts these subjective management evaluations. And this Court may set aside a Board determination of motive if it is not supported by substantial evidence. *See Dash v. NLRB*, 793 F.2d 1062, 1066 (9th Cir. 1986). Here, substantial evidence supports that the concerns of Macy's management were bona fide.

On top of that, the Board's rule on which its finding of a violation rests requires an employer to explain in specific detail the exact steps that the Union could take to end the lockout. But sometimes an employer starts a lockout because of circumstances that a union cannot change. A company might have concerns about unit employees restriking during a pivotal period of business, as was the case here. A company might have valid concerns about sabotage, as Macy's did here. Only after the employer has assured itself that the situation has been appropriately addressed will it welcome back the employees. That is also what happened here.

The Board has recognized that an employer may lock out employees for

---

age…"). That Macy's instead devoted substantial testimony to concerns of misconduct and sabotage shows those concerns were valid.

defensive purposes *without* articulating steps that the Union can take to end the lockout. That the Board held Macy's to a different standard here shows that its decision is irrational. For example, in *Sociedad Española de Auxilio Mutuo y Beneficiencia*, 342 NLRB 458 (2004), a health care provider locked out the entire bargaining unit at a hospital because of concerns about finding sufficient personnel in event of the union's possible strike. In *Sociedad*, the union notified a hospital that it intended to strike on two three-day periods during the holiday season. *Id.* at 460. The facility decided to engage in a lockout between those two planned work stoppages. Even though the union cancelled its first strike, the hospital not only kept the lockout in place but even moved it up to cover the period of the union's planned first strike. The Board recognized that the hospital had a legitimate business justification for its actions that validated the lockout, in that case continuity of patient care. *Id.* at 461-62. There was nothing the union could do to end the lockout. Other Board decisions concur that an employer may engage in a lockout for defensive reasons. *See Boehringer Ingelheim Vetmedica, Inc.*, 350 NLRB 678 (2007) (employer lawfully locked out entire bargaining unit over concerns about possible product contamination); *Stepan Co.*, 352 NLRB 79, 87 (2008) (employer locked out all employees following sickout and 24-hour strike because of "safety concerns," requiring a "contract and labor peace" before ending the lockout).

43

Thus, under the *Great Dane* analysis that the Board was required to perform, but failed to do, Macy's lockout was not inherently destructive of union rights, and finding a violation of Section 8(a)(3) here would not strike the proper balance, for these defensive reasons.

> ### D. The Board erred in the remedies issued against Macy's, if any.

> #### 1. Macy's is liable for at most three days' remedies because it cured and established no adverse impact on later bargaining.

The Board found Macy's liable for damages throughout the lockout based on its theory that a lockout "unlawful at its inception retains its initial taint of illegality until it is terminated and the affected employees are made whole." *Movers and Warehousemen's Assn. of Washington DC*, 224 NLRB 356, 357 (1976), enfd. 550 F.2d 962. Under that precedent, however, an employer can avoid further liability for its violation if it can show that the "failure to restore the status quo ante had no adverse impact on the subsequent collective bargaining." *Id.* at 358.

This Board doctrine may have some merit in the most common lockout violation where antiunion animus motivates the lockout. In such a situation, the employer can take no action to "fix" the lockout caused by its animus other than ending it. But that standard does not work here where the *only* basis for a violation is that the lockout did not contain a simultaneous full bargaining position. An

employer such as Macy's can fix that violation by providing a full bargaining proposal, which is what Macy's did. So even if the Board were correct that Macy's violated the Act with its December 7 lockout because no offer was on the table, as of December 10 the Union had that offer. As a result, from then on there was absolutely nothing wrong with the lockout. The Board's position that Macy's should be liable for damages until the lockout ends is thus arbitrary and capricious.

The ALJ found that Macy's failed to carry its burden to show that the "failure to restore the status quo ante had no adverse impact on the collective bargaining." *Macy's Inc.*, 372 NLRB No. 42 at 20; ER-22. The ALJ even asserted that "[n]o such evidence was presented by Respondent at the hearing." *Id.* These findings are erroneous. The ALJ failed to explain why he believed that no evidence was presented at the hearing. In fact, he ignored substantial evidence that the parties negotiated in good faith after the lockout. If the lockout had adversely impacted the parties' ongoing bargaining, then the Record would show either: (1) the parties did not bargain in good faith because of the lockout; or (2) the Union was forced to accept a substandard proposal because of the lockout. Yet Macy's and the Union immediately engaged in bargaining after the lockout started, leading to three bargaining sessions in one week during December 2020, with both sides exchanging proposals. (2-SER-372–73; 2-SER-392–93; 2-SER-394–95; 2-SER-396–97; 1-SER-90–95). The Record also shows that as of the hearing in June

2021 the Union had not yet accepted an inferior proposal. (1-SER-92–95). In summary, the evidence introduced at the hearing by both Macy's and the Union shows that Macy's lockout did not undermine the parties' bargaining.

In the alternative, the Court may also reject the Board's rationale because the ALJ's conclusion, affirmed by the Board, was premature. The parties did not litigate the scope of damages at the ULP hearing because when there is a dispute over damages in Board matters that dispute is litigated at a separate compliance hearing. *See* 29 C.F.R. § 102.54.

The General Counsel never sought a specific amount of damages because such calculations are best made at the Board's compliance stage. Likewise, although Macy's did advance sufficient evidence to contradict the ALJ's ultimate finding on this issue, Macy's did not directly litigate the scope of damages because, plainly, those issues are best litigated at compliance. As Member Hayes observed in *Alden Leeds*, an employer can avoid damages for an unlawful lockout "'if it is able to show affirmatively [in compliance proceedings] that a failure to restore the status quo ante did not adversely affect subsequent bargaining.'" 357 NLRB 84, 84 n.3 (citing *Greensburg Coca-Cola Bottling Co.*, 311 NLRB 1022, 1029 (1993)). As a result, Macy's did not need to raise or litigate the matter at the initial stage of the proceeding.

///

46

## 2. *Thryv* was wrongly decided.

In its recent decision in *Thryv*, the Board ruled that employees harmed by an employer's unfair labor practices should be compensated "for all direct or foreseeable pecuniary harms that these employees suffer…" *Thryv*, 372 NLRB No. 22 at *1. As the Board's own website explains, that decision opens the door for the Board to compensate purported victims of an unfair labor practice for expenses that, contrary to the Board's description, are plainly not a "direct and foreseeable result" of an unfair labor practice such as "out-of-pocket medical expenses [and] credit card debt." Board Rules Remedies Must Compensate Employees for All Direct or Foreseeable Financial Harms, https://www.nlrb.gov/news-outreach/news-story/board-rules-remedies-must-compensate-employees-for-all-direct-or. The Board erred in adopting this standard for several reasons.

First, the Board lacks the authority to award damages for purportedly foreseeable financial harms. In essence, the Board permitted itself to award compensatory damages if the Board determines those damages are direct or foreseeable. Yet the Supreme Court has cautioned that the Board's authority to award damages under Section 10(c) is limited, and its power to order affirmative relief "is merely incidental to the primary purpose of Congress to stop and prevent unfair labor practices." *Auto. Workers v. Russell*, 356 U.S. 634, 642-43 (1958).

The Court has made clear that the Board lacks the authority to award "full compensatory damages for injuries caused by wrongful conduct." *Id.* at 643. The reason for this is simple. The Board is "not a court … it is an administrative agency charged by Congress with the enforcement and administration of the federal labor laws." *Shepherd v. NLRB*, 459 U.S. 344, 351 (1983). So while a court may be able to fashion remedies for "complete relief," the Board cannot "reflexively order" complete relief for every unfair labor practice. *Id.* at 352; *see also Gurley v. Hunt*, 287 F.3d 728, 731 (8th Cir. 2002) ("the NLRB is not authorized to award full compensatory … damages to individuals affected by the unfair labor practice.").

Second, *Thryv* grants the Board unfettered discretion to determine whether a pecuniary loss is direct or foreseeable. As the dissent explained in that decision, such a standard "would permit recovery for any losses indirectly caused by an unfair labor practice, regardless of how long the chain of causation may stretch from unfair labor practice to loss, whenever the loss is found to be foreseeable." *See Thryv*, 372 NLRB No. 22, at *16 (dissent). The Board's new standard practically begs the Board's General Counsel to seek awards of "speculative damages that go beyond the Board's remedial authority." *Id.*

Third, *Thryv* and the examples that it provides of purportedly foreseeable pecuniary harms turns employment law jurisprudence on its head. The Board

claims that financial damages caused by an unlawful termination might include credit card interest and late fees, recompense for the loss of a car or home if unable to make loan or mortgage payments, or even increased transportation or childcare costs. *See Thryv*, 372 NLRB No. 22, at *9 (citing *The Voorhees Care & Rehabilitation Center*, 371 NLRB No. 22, at *4 n. 14 (2021)). It cannot be seriously argued that these damages stem from an unlawful termination. Rather, they are at least a step or two removed from the termination decision. Any claim of foreseeability runs headfirst into a discriminatee's duty to mitigate damages, which applies in NLRB proceedings. *See Black Magic Resources*, 317 NLRB 721 (1995). So any employer must assume that a discriminatee will take proactive measures to place himself in similar economic circumstances as soon as possible after the termination. For that reason, discriminatees will likely have widely different mitigation outcomes. Some might find a new job immediately. Some might have to search over a month. Some might find jobs that pay more. Whatever those variable outcomes, though, devastating economic consequences such as the loss of a house cannot ever be viewed as foreseeable given the duty to mitigate.[5]

---

[5] The Board's decision also fails to recognize the many other fail-safes built into modern society and family life to make all these economic consequences unforeseeable, such as unemployment insurance, food stamps, savings accounts, and other family members with alternative sources of income that can cover expenses for a period.

Fourth, despite the Board's protests to the contrary (*see Thryv*, 372 NLRB No. 22, at *8-9), the pecuniary damages that it seeks to award are the wolf of consequential damages in the sheep's clothing of "make-whole" relief. Indeed, the Board's initial request for amicus briefing in *Thryv* sought input on whether the Board should include "relief for consequential damages." *Thryv, Inc.*, 371 NLRB No. 37, at *1 (2021). Which makes sense, because consequential damages include losses like those the Board now claims it can award that "do not flow directly and immediately from an injurious act, but that result indirectly from the act." *See* Black's Law Dictionary, p. 394 (7th Edition).

The Board presumably refuses to properly label these damages because it recognizes that Supreme Court precedent forecloses an award of consequential damages as part of make-whole relief. In *United States v. Burke*, the Court evaluated the damage remedies available under Title VII of the Civil Rights Act of 1964. It held that make-whole relief consists of "restoring victims, through backpay awards and injunctive relief" to wage and employment positions they would have had even without the unlawful discrimination. *United States v. Burke*, 504 U.S. 229, 239 (1992). The Court cautioned, however, that the "remedial scheme" did not provide for compensating a plaintiff for traditional harms associated with personal injury, such as "pain and suffering, emotional distress … or other consequential damages (e.g., a ruined credit rating)." *Id.*

*Burke* involved the remedial scheme of Title VII, but the Supreme Court had explained before that the Title VII remedial scheme evaluated by it in *Burke* was modeled after the Act's remedial scheme. *See Albermarle Paper Co. v. Moody*, 422 U.S. 405, 419 n. 11 (1975). Thus, the Court's express limitations in *Burke* apply with equal force to Section 10(c) of the Act. In fact, circuit courts interpreting Title VII observed that the legislative history and language of that statute at the time suggested that Title VII was modeled after 29 U.S.C. § 160(c), which several circuit courts had found did not permit awards of compensatory damages. *See Walker v. Ford Motor Co.*, 684 F.2d 1355, 1363-64 (11th Cir. 1982) (collecting cases).

Finally, the Board should not be allowed to usurp Congress' duty to pass laws, including the potential remedies for violating those laws. *Burke* evaluated Title VII before Congress amended it. That law now provides for compensatory damages after the passage of the Civil Rights Act of 1991. The passage of that act, however, would not have been necessary if courts had already found Title VII permitted compensatory damages. The Board simply ignores this precedent in *Thryv*. It does not address *Burke*, *Albemarle*, *Walker*, or any of the circuit decisions that rejected the expansive damages approach now taken by the Board in *Thryv*. The Board has decided to unilaterally grant itself power to award wide sweeping remedies beyond those contemplated by Congress. It cannot. If the

51

Board wants to award the damages that it now seeks to add to its enforcement arsenal, whether termed "compensatory damages," "consequential damages," or "make-whole relief," it must wait for Congress to grant it that authority by amending the Act, just as Congress did when it amended Title VII.

### 3. The Board erred in applying *Thryv* retroactively.

The Board amended the ALJ's order to provide recompense for the "direct or foreseeable pecuniary harms" caused by the lockout. *Macy's Inc.*, 372 NLRB No. 42 at *1 n.2; ER-3. The Board did so presumably because its usual practice is to apply all new policies and standards to all pending cases in whatever stage. *Levitz Furniture Co. of the Pacific*, 333 NLRB 717, 729 (2001). Yet applying *Thryv* to this pending case would be severely inequitable. As the Board has recognized, retroactive application is unwarranted where the ill effects of retroactive application would cause "manifest injustice." *See Alan Ritchey, Inc.*, 359 NLRB 396, 406 (2014), citing *SNE Enterprises*, 344 NLRB 673, 673 (2005). In evaluating whether retroactive application would cause manifest injustice, the Board considers: (1) the reliance of the parties on preexisting law, (2) the effect of retroactivity on accomplishment of the purposes of the Act, and (3) any particular injustice arising from retroactive application. *Id.*

Macy's reliance on extant Board law establishes why retroactively applying any new standard would cause a manifest injustice here. Just as in *Alan Ritchey*,

Macy's could have rightly assumed that, even if the Board were to find its lockout unlawful, that it would not be forced into extensive compliance proceedings under an amorphous standard that imposed liability for purportedly foreseeable damages. Rather, Macy's could evaluate its exposure through analyzing the Board's traditional back pay remedy. While the Board attempts to downplay the change implemented through *Thryv*, no employer would have ever contemplated being on the hook for credit card expenses incurred by locked out employees. The Board found the employer acted properly in *Alan Ritchey* because the Board had never issued a decision about the lawfulness of the employer's conduct at issue. *Alan Ritchey*, 359 NLRB at 406. Macy's also plainly would have relied on Board law as it was back in 2020 to evaluate its exposure if the Board were to incorrectly find a violation of the Act.

In *Alan Ritchey*, the Board declined to apply its decision retroactively because doing so "could well catch many employers by surprise and, moreover, expose them to significant financial liability …." *Alan Ritchey*, 359 NLRB at 406. Those same principles apply with even more force here. First, employers such as Macy's who declare a lockout already must navigate a legal minefield to ensure no inadvertent violations of the Board's purported requirements for a lawful lockout. Here, of course, the *only* basis for a violation was that Macy's technically did not have a full offer on the table at the exact moment that it declared the lockout. The

53

General Counsel did not allege, nor did the Board find, that Macy's had acted in bad faith or otherwise acted against the Union with animus.

While Macy's has argued throughout this brief that the Board simply erred in finding a violation of the Act, imposing *Thryv* retroactively could expose Macy's to inordinate and unexpected financial liability. In *Alan Ritchey*, the Board was concerned that individualized backpay awards could impact unsuspecting employers. Similarly, here, Macy's might now have to defend against a multitude of individualized claims in a compliance proceeding that certain employees have suffered allegedly "foreseeable" pecuniary losses. As a result, even if this Court were to accept that the Board could award *Thryv* damages, the "unexpected burden" on Macy's would militate against retroactive application. *See id.*

### III. The Union is not entitled to the extraordinary relief that it seeks.

The Union's Opening Brief asks for four extraordinary remedies that the Board declined to order.[6] This Court should reject them all because the Board did not abuse its discretion in declining to order these "extraordinary" remedies. *See Macy's Inc.*, 372 NLRB No. 42, at *1 n. 2; ER-3. The Board's finding of a violation of the Act here did not hinge on egregious anti-union conduct by Macy's.

---

[6] The Union filed 19 cross-exceptions to the ALJ's decision, all objecting to the scope of the remedy. (ER-27–31). The Union does not seek review of the Board's decision to refuse to order some of the more extreme extraordinary remedies sought, such as its request that the Union be permitted to designate workers to replace those who choose not to return to work. (ER-28).

Rather, it hinged on technical arguments that the ALJ and the Board accepted about the validity of Macy's lockout. As a result, the Board readily concluded that its "traditional remedies are sufficient to effectuate the policies of the Act in this matter." *Id.*; *see also Amerinox Processing, Inc.*, 371 NLRB No. 105 (2022) (Board ordered additional remedies because of "serious and pervasive unfair labor practices" and a "history of egregious violations.").

Each specific request should also be rejected on the merits. First, the Board only requires a notice reading by management where "violations are so numerous and serious that the reading aloud of a notice is considered necessary to enable employees to exercise their Section 7 rights in an atmosphere free of coercion, or where the violations in a case are egregious." *United States Postal Service*, 339 NLRB 1162, 1163 (2003). Contrary to the Union's suggestion, a single lockout of a single bargaining unit is not a "persistent and widespread" violation that requires such a notice reading. *See* Union AOB at 11.

Second, the Union asserts that the notice should be posted for more than 60 days. But again, whenever the Board has ordered postings for more than the customary 60-day period it has done so in response to egregious misconduct. *See*, *e.g.*, *HTH Corp.*, 361 NLRB 709 (2014) (three-year notice posting in response to a "10-year history of violations before us and the Federal courts," including flagrant contempt of federal court orders). Given the difference between this case and

*HTH*, for example, the Board could have readily concluded that a longer notice posting period was unnecessary.

Third, the Union claims that the Board erred in declining to require Macy's to mail the notice to "all employees of Macy's at the locations where locked-out employees worked and to the locked-out employees." Union AOB at 15. Beyond the Union's thirst for vengeance there is no reason to require this notice to be mailed to every employee at locations where bargaining unit members worked. Bargaining unit members worked in facilities maintenance at Macy's locations in a support role. To require the notice to be mailed to nonunit employees would result in a substantial cost of sending a notice to thousands of uninvolved employees. There is no record evidence of any non-unit employees being impacted by the lockout. Even the Union's request to mail the notice to its members is also overbroad. To obtain this relief the Union must show that "this additional measure is needed to remedy the effects of the Respondent's unfair labor practices." *The Guild San Jose*, 370 NLRB No. 47 (2020). Here, a notice posting is adequate given that all bargaining unit workers work onsite.

Finally, the Union strains to find another basis for challenging the Board's decision by claiming that the notice of a violation is somehow inadequate. It's unclear why. The notice explains that the Board found that Macy's violated Federal labor law. It explains that Macy's will not lock out employees in the

manner that it did.  And, as the Union recognizes, the Board's notice even provides a QR code that can be scanned to read the full text of the Board's decision.  *See Macy's, Inc.*, 372 NLRB No. 42, at *2-3; ER-4–5.  Such a notice is plainly adequate to inform those interested the basis for the Board's finding that Macy's violated the Act.

In summary, none of the Union's arguments have any persuasive force. Indeed, the Union seems to have halfheartedly generated its Opening Brief, much like its Exceptions Brief before the Board, solely to improperly take away Macy's statutory right as the truly aggrieved party to choose the appeal forum of its choice. The Court should not countenance such gamesmanship.  At a minimum, it should deny the Union the relief that it seeks.

///

///

///

///

///

///

///

///

///

## CONCLUSION

The Court should dismiss the Union's petition for review and transfer the remaining proceedings to the Fifth Circuit. If the Court does reach the merits it should deny the Union's petition for review, grant Macy's petition for review, deny the Board's application for enforcement, and vacate the Board's order.

Dated: August 23, 2023

Respectfully submitted,

s/ Dylan B. Carp
Dylan B. Carp
Daniel D. Schudroff
JACKSON LEWIS P.C.

*Attorneys for Petitioner/Cross-Respondent/Intervenor*
MACY'S INC.

## Statement of Related Cases

Petitioner is unaware of any cases pending in this Circuit that satisfy the definition of "related cases" under Ninth Circuit Rule 28-2.6.

### Certificate of Compliance

This brief complies with the type-volume limitations of Ninth Circuit Rule 32-1 because it contains 13,496 words, excluding the parts of the brief exempted by Fed. R. App. P. ("Rule") 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

Dated: August 23, 2023

Respectfully submitted,

s/ Dylan B. Carp
Dylan B. Carp
Daniel D. Schudroff
JACKSON LEWIS P.C.

*Attorneys for Petitioner/Cross-Respondent/Intervenor*
MACY'S INC.

**ADDENDUM**

29 U.S.C. § 160 (f).  Review of final order of Board on petition to court

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

Relevant portions of 29 U.S.C. § 158(a).  Unfair labor practices by employer

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

…

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such

1

agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; …