**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, STATIONARY ENGINEERS, LOCAL 39, | No. 23-124 |
| | NLRB No. 20-CA-270047 |
| *Petitioner*, | OPINION |
| v. | |
| NATIONAL LABOR RELATIONS BOARD, | |
| *Respondent*, | |
| ---------------------------------------- | |
| MACY'S INC., | |
| *Intervenor*. | |

| | |
|---|---|
| MACY'S INC., | No. 23-150 |
| *Petitioner*, | NLRB No. 20-CA-270047 |
| v. | |
| NATIONAL LABOR RELATIONS BOARD, | |

*Respondent*,

-----------------------------------------

INTERNATIONAL UNION OF
OPERATING ENGINEERS,
STATIONARY ENGINEERS,
LOCAL 39,

*Intervenor*.

---

NATIONAL LABOR RELATIONS
BOARD,

*Petitioner*,

  v.

MACY'S INC.,

*Respondent*,

-----------------------------------------

INTERNATIONAL UNION OF
OPERATING ENGINEERS,
STATIONARY ENGINEERS,
LOCAL 39,

*Intervenor*.

No. 23-188

NLRB No.
20-CA-270047

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted March 28, 2024
San Francisco, California

Filed January 21, 2025

Before: Evan J. Wallach,[*] Jacqueline H. Nguyen, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Wallach;
Partial Dissent by Judge Bumatay

## SUMMARY[**]

### Labor Law

The panel denied petitions for review brought by the
International Union of Operating Engineers, Stationary
Engineers, Local 39 (the "Union") and Macy's Inc., and
granted the National Labor Relations Board's cross-
application for enforcement of its final order in a case in
which the Union charged Macy's with unfair labor practices
under the National Labor Relations Act ("NLRA").

---

[*] The Honorable Evan J. Wallach, United States Circuit Judge for the
Federal Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

During negotiations over a successor collective bargaining agreement, Union members voted to reject Macy's Final Offer and began a strike. After three months, the Union ended its strike and unconditionally offered to return to work. Macy's locked out the Union members who reported for work. The Union charged that Macy's lockout was an unfair labor practice. The Board adopted the conclusion of the ALJ, and found that Macy's violated the NLRA.

The panel held that it had jurisdiction because the Union is a "person aggrieved."

The panel rejected Macy's contention that it could lawfully lock out the employees under Section 8(a)(1) and (3) of the NLRA because it could not show legitimate and substantial business justifications for the lockout. The Board applied the correct legal standard when it considered *Dayton Newspapers, Inc.,* 339 N.L.R.B. 650 (2003). Reviewing the record as a whole, the panel found substantial evidence supporting the Board's conclusion that Union employees were not clearly and fully informed of conditions they needed to satisfy to be reinstated. Considering *Dayton Newspapers*, the panel concluded that the lockout was not justified.

Finding no clear abuse of discretion, the panel enforced the Board's remedial order. The Board did not abuse its discretion in declining to award additional extraordinary remedies, requested by the Union, because the traditional remedies awarded were sufficient to effectuate the policies of the NLRA here. Rejecting Macy's challenges, the panel held that the Board did not clearly abuse its discretion in ordering make-whole relief pursuant to *Thryv, Inc*., 372 N.L.R.B. No. 22 (Dec. 13. 2022).

Dissenting in part, Judge Bumatay would hold that the Board had no authority to order the type of monetary relief it did, requiring Macy's to pay foreseeable or consequential damages—compensating Union members for ongoing harms accumulating to this day—more than four years since the lockout. The Board's actions were arbitrary and capricious and unsupported by the record. While he agreed with the denial of the Union's petition for review, he dissented from the denial of Macy's petition for review and from the grant of the Board's application for enforcement.

## COUNSEL

David A. Rosenfeld (argued) and Sara J. Zollner, Weinberg Roger & Rosenfeld, Emeryville, California; Gary P. Provencher, Weinberg Roger & Rosenfeld, Sacramento, California; for Petitioner.

Barbara A. Sheehy (argued), Attorney; Usha Dheenan, Supervisory Attorney; David Habenstreit, Assistant General Counsel; Ruth E. Burdick, Deputy Associate General Counsel; Peter S. Ohr, Deputy General Counsel; Jennifer A. Abruzzo, General Counsel; National Labor Relations Board, Washington, D.C.; for Respondent.

M. Christopher Moon (argued), Jackson Lewis PC, Salt Lake City, Utah; Dylan B. Carp and Laura A. Pierson-Scheinberg, Jackson Lewis PC, San Francisco, California; Daniel D. Schudroff, Jackson Lewis PC, New York, New York; for Intervenor.

## OPINION

WALLACH, Circuit Judge:

When engaging in "collective bargaining" under the National Labor Relations Act ("NLRA" or the "Act"), "representatives of an employer and a union attempt to reach an agreement by negotiation, and, failing agreement, are free to settle their differences by resort to such economic weapons as strikes and lockouts, *without any compulsion to reach agreement*." *NLRB v. Amax Coal Co.*, 453 U.S. 322, 336 (1981) (emphasis added) (citations omitted); *see also* 29 U.S.C. § 158(a), (d) (listing certain prohibited unfair labor practices by an employer and imposing an obligation for collective bargaining). During negotiations over a successor collective bargaining agreement ("CBA"), communications between Macy's Inc. ("Macy's" or the "Company") and the International Union of Operating Engineers, Stationary Engineers, Local 39 (the "Union") set off a chain reaction. The Union members voted to reject the Company's last, best, and final offer (the "Final Offer") and began a strike. After the Final Offer expired, the Union offered its proposal on wages and pensions, which Macy's then rejected. After three months, the Union ended its strike and unconditionally offered to return to work. Three days later, Macy's locked out the Union members who reported for work.

The Union filed its Charge Against Employer ("Charge") with the National Labor Relations Board ("NLRB" or the "Board"), alleging that the Company's lockout was an unfair labor practice under the NLRA. An Administrative Law Judge ("ALJ") ultimately ruled in the Union's favor.

The Board adopted the conclusion of the ALJ, who found that Macy's violated Section 8(a)(1) and (3)[1] of the Act, 29 U.S.C. § 158(a)(1), (3), when on December 7, 2020, Macy's locked out its employees without presenting a timely, clear, and complete offer that set forth the conditions necessary to avoid a lockout. *Macy's, Inc.*, 372 N.L.R.B. No. 42 (Jan. 17, 2023) ("Decision and Order"). The Board amended the ALJ's recommended Order with respect to remedial provisions, modifying the "make-whole remedy" to include direct or foreseeable pecuniary harms incurred due to the lockout. Before us are three prayers for relief: (1) the Union petitions for remand for the Board to reconsider its requested additional remedies; (2) Macy's petitions for dismissal of the Union's petition and transfer of the proceedings elsewhere, or alternatively, either remand or reversal on the merits in its favor; and (3) the Board applies for enforcement of its final Order. We have jurisdiction under 29 U.S.C. § 160(e)–(f). We deny the

---

[1] Under Section 8(a)(1) and (3) of the NLRA:

> It shall be an unfair labor practice for an employer—
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
>
> \*\*\*
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

29 U.S.C. § 158(a)(1), (3); *see also Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983) ("[A] violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1)." (citations omitted)).

Union's and the Company's Petitions for Review and grant the Board's Cross-Application for Enforcement.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

Macy's is a retail business with more than 700 stores and 75,000 employees nationwide. The Union represents building engineers and craftsmen who perform carpentry, painting, as well as maintenance and repair work, especially on heating, ventilation, and air conditioning (HVAC) and electrical systems, at two Macy's stores in Reno, Nevada, and approximately forty other stores across Northern California and the San Francisco Bay Area. On April 1, 2020, Macy's laid off about sixty Union engineers, after closing its stores and furloughing most of its employees in response to the COVID-19 pandemic. Later that year, Macy's started to reopen its stores, and by mid-August, it recalled forty-three Union engineers back to work.

For over twenty years, Macy's and the Union maintained a collective-bargaining relationship. In July 2020, Macy's and the Union began bargaining for a successor CBA since the CBA then in place, covering between sixty to seventy Union employees, was set to expire on August 31, 2020. After nearly a dozen bargaining sessions, they had yet to reach an agreement. On August 31, 2020—the day the CBA would expire—Macy's presented its Final Offer proposing terms relating to wages and pensions. On September 2, 2020, the Union members overwhelmingly voted to reject the Final Offer and the Union decided it would begin its strike in two days. From September 4, 2020, to December

---

[2] Only the factual assertions pertinent to resolving the matter before us are presented here, and they are primarily drawn from the findings within the April 6, 2022 ALJ's Decision ("ALJ's Decision"), which the Board affirmed in its January 17, 2023 Decision and Order.

4, 2020, the Union staged its strike, picketing every day during business hours at Macy's Union Square store in San Francisco. Macy's argued before the ALJ that during the strike, the Union employees engaged in a variety of misconduct and sabotage.

On October 8, 2020, Rose Ashmore ("Ashmore"), the Company's lead negotiator, told Jay Vega ("Vega"), the Union's lead negotiator, over the phone that the Final Offer would expire in a week; Ashmore confirmed this once more in an email to Vega four days later. On October 15, 2020, the Final Offer expired. Vega called Ashmore on November 9, 2020, and asked if Macy's would present another offer. Ashmore said no, but asked whether the Union would like to resume bargaining; Vega said he would get back to her. On November 25, 2020, the day before Thanksgiving, Vega sent an email to Ashmore including the Union's proposal on wages and pensions. Ashmore replied to Vega over text, notifying her receipt of the email and her inability to speak with her team at Macy's about the offer until after the holiday.

On December 4, 2020, Ashmore emailed Vega rejecting the Union's wage proposal. That same day, Vega replied that the Union no longer wished the dispute to continue, so it was making "an unconditional offer to return our members to work immediately." After Vega sent this email, the Union ended its strike and stopped picketing. Later that evening, Ashmore replied to Vega, stating that she would respond to the Union's unconditional offer by the end of business on Monday, December 7, 2020, because she needed to discuss the offer "with all necessary partners." In the reply, Ashmore told Vega "please do not have the members report to work yet." Vega asked her over email, "[d]oes this mean you are locking them out till Monday?" On December 5,

2020, Ashmore answered that Macy's would need to fully evaluate "several administrative, logistical, and economic issues" implicated by the Union's "unexpected offer," and requested "the courtesy of giving us until the close of business Monday to assess." On December 6, 2020, Vega responded that "[u]nfortunately, we cannot accommodate your request. Unless you are locking them out, they will [be] showing up to work Monday morning." Ashmore replied, repeating that "the team should not return to work on Monday," as well as stating that "[t]his is not a lockout but we won't be ready for them."

On Monday, December 7, 2020, some Union engineers started returning to work but were turned away. That same day, Ashmore emailed Vega, asserting "[w]e are not willing to reinstate bargaining [Union] employees until there is an agreement in place; this decision is being made in support of our bargaining position."

On December 10, 2020, Macy's and the Union engaged in subsequent negotiations. Ashmore emailed Vega the Company's new bargaining proposal, which includes wage increases that were reduced from those within the Final Offer. The Union countered with an offer to cap wages at the rates originally proposed in the Final Offer. No deal was made. The next day, Macy's presented another proposal, which was still worse than the Final Offer. The Union gave its additional proposal, deleting certain provisions from the contract. Once again, Macy's and the Union failed to reach an agreement.

On December 9, 2020, and February 4, 2021, the Union respectively filed its original and first amended Charge forms with the NLRB, alleging that Macy's committed an unfair labor practice by locking out the Union engineers after

they gave their unconditional offer to return to work. On February 11, 2021, the NLRB issued its Complaint and Notice of Hearing ("Complaint"), which alleges that Macy's violated Section 8(a)(1) and (3) of the Act. In June 2021, the ALJ conducted a six-day hearing, and at that time, Macy's and the Union "had still not reached an agreement on a new contract, and [the Company's] lockout of the engineers continued."

In the ALJ's Decision issued on April 6, 2022, the ALJ concluded that Macy's violated Section 8(a)(1) and (3) of the NLRA, "[b]y locking out its employees on December 7, 2020, without providing them with a timely, clear, or complete offer, which sets forth the conditions necessary to avoid the lockout[.]" The ALJ recommended that Macy's "offer reinstatement to all employees who were unlawfully locked out and make them whole for any losses of pay and benefits that they may have suffered by reason of the lockout," including "search-for-work and interim employment expenses, regardless of whether those expenses exceed interim earnings." With respect to the ALJ's Decision, Macy's filed its Exceptions and the Union filed its Cross-Exceptions.

On January 17, 2023, the Board in its Decision and Order affirmed the ALJ's rulings, findings, and conclusions, and adopted the ALJ's recommended Order, making two modifications. The Board modified the ALJ's recommended Order, first, "to conform to the violations found and to the Board's standard remedial language, and in accordance with" prior NLRB decisions, and second, to amend the "make-whole remedy" to provide that Macy's "*shall also compensate the employees for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful lockout*, including reasonable search-for-work and

12     INT'L UNION OF OPERATING ENGINEERS v. NLRB

interim employment expenses, if any, regardless of whether these expenses exceed interim earnings."

Macy's petitioned for review over the Board's Decision and Order in the Fifth Circuit, and the Union filed its petition in this Court. Pursuant to 28 U.S.C. § 2112, the Judicial Panel on Multidistrict Litigation transferred their Petitions for Review here, after this Court was randomly selected. The NLRB filed a Cross-Application for Enforcement of its final Order. These three petitions were consolidated here.

## II.  STANDARD OF REVIEW

We "must uphold a Board decision when substantial evidence supports its findings of fact and when the agency applies the law correctly." *United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 777 (9th Cir. 2017) (internal quotation marks and citation omitted). "We review de novo whether the Board applied the correct legal standard." *NLRB v. Bingham-Willamette Co.*, 857 F.2d 661, 663 (9th Cir. 1988) (citing *Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 182 (1971)). The Board's factual findings "shall be conclusive" if they are "supported by substantial evidence on the record considered as a whole . . . ." 29 U.S.C. § 160(e)–(f). "The Board has special expertise in drawing" inferences of unlawful motive and credibility, so "its determinations are entitled to judicial deference." *Kallmann v. NLRB*, 640 F.2d 1094, 1099 (9th Cir. 1981) (citation omitted); *accord Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951) ("We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion.").

Moreover, the Board's "discretion in selecting remedies is 'exceedingly broad,' and we will enforce a remedy 'unless it represents a clear abuse of discretion.'" *NLRB v. Ampersand Publ'g, LLC*, 43 F.4th 1233, 1236 (9th Cir. 2022) (quoting *NLRB v. C.E. Wylie Constr. Co.*, 934 F.2d 234, 236 (9th Cir. 1991)). "Such an abuse of discretion is present if it is shown that the order is a patent attempt to achieve ends other than those that can be fairly said to effectuate the policies of the Act." *Id.* at 1236–37 (quoting *Wylie*, 934 F.2d at 236).

"Because the Board adopted the ALJ's analysis" by affirming the ALJ's rulings, findings, and conclusions, "we treat the Board's order and the adopted ALJ analysis as one order." *Kava Holdings, LLC v. NLRB*, 85 F.4th 479, 491 n.5 (9th Cir. 2023) (citation omitted).

## III. DISCUSSION

To address the inherent "inequality of bargaining power" between employers and "employees who do not possess full freedom of association or actual liberty of contract," 29 U.S.C. § 151, the NLRA "'encourag[es] the practice and procedure of collective bargaining,' between labor and management to resolve 'industrial disputes arising out of differences as to wages, hours, or other working conditions,'" *Glacier Northwest, Inc. v. Teamsters*, 598 U.S. 771, 775 (2023) (alteration in original) (quoting 29 U.S.C. § 151). "The NLRA makes it unlawful for an employer to engage in unfair labor practices[.]" *Hooks ex rel. NLRB v. Nexstar Broad., Inc.*, 54 F.4th 1101, 1106 (9th Cir. 2022) (citing 29 U.S.C. § 158). The NLRA also "grants the Board broad discretion to impose remedies for unfair labor practices." *Ampersand*, 43 F.4th at 1238 (cleaned up). "The Board may take any 'affirmative action'

that 'will effectuate the policies' of the Act." *Id*. (first quoting 29 U.S.C. § 160(c); then citing *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 539–40 (1943)). "Within this limit the Board has wide discretion in ordering affirmative action; its power is not limited to the illustrative example of one type of permissible affirmative order, namely, reinstatement with or without back pay." *Va. Elec.*, 319 U.S. at 539 (citing *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 187, 189 (1941)). "The particular means by which the effects of unfair labor practices are to be expunged are matters 'for the Board not the courts to determine.'" *Id.* (quoting *Int'l Ass'n of Machinists v. NLRB*, 311 U.S. 72, 82 (1940)).

The Board here found that the Company's lockout constituted unfair labor practices under Section 8(a)(1) and (3) of the Act. We deny both the Union's and the Company's Petitions for Review, and we grant the Board's Cross-Application for Enforcement for the following reasons: (1) we have jurisdiction over this consolidated appeal; (2) substantial evidence supports the Board's factual findings regarding the Company's unlawful lockout; (3) the Board's selection of remedies here is not a clear abuse of discretion; and (4) the Board's final Order is enforceable under the circumstances here disclosed.

## A. Jurisdiction

"A federal court of appeals may review the Board's final order, if an aggrieved party seeks judicial review or if the Board seeks enforcement of its order." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 343 (2024) (citing 29 U.S.C. § 160(e)–(f)). Macy's argues that the Union lacks standing as a "person aggrieved" by the Board's Decision and Order within the meaning of § 160(f), because the Union "does not

INT'L UNION OF OPERATING ENGINEERS v. NLRB          15

deny that the Board granted it all of the relief that it had specifically sought in the [C]harge form[s] and [C]omplaint."**³** *Int'l Union of Operating Eng'r Loc. 501 v. NLRB*, 949 F.3d 477, 482 (9th Cir. 2020). We review this jurisdictional question de novo, *see Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (9th Cir. 2022), and conclude that we have jurisdiction because the Union is a "person aggrieved."**⁴**

After Macy's filed its Exceptions to the ALJ's Decision, the Union properly requested additional remedies not granted by the ALJ in its Cross-Exceptions. *See* 29 C.F.R. § 101.11(b) ("Whenever any party files exceptions, any other party . . . may file cross-exceptions relating to *any portion* of the administrative law judge's decision." (emphasis added)). Among other things, the ALJ's recommended Order required that Macy's, at "all locations

---

³ The NLRB's "'authority kicks in when a person files a charge with the agency alleging that' an employer or labor union has engaged in an unfair labor practice." *McKinney*, 602 U.S. at 342–43 (first quoting *Glacier*, 598 U.S. at 775; then citing 29 C.F.R. § 101.2 (2021)). Next, a Regional Director investigates the charge. *Id.* at 343 (citing 29 C.F.R. § 101.4 (2023)). "If the charge appears to have merit," 29 C.F.R. § 101.8, then the Regional Director "institutes a formal action against the offending party by issuing an administrative complaint," *McKinney*, 602 U.S. at 343 (citing 29 C.F.R. § 101.8). The NLRB General Counsel "prosecutes the government's case." *Ampersand*, 43 F.4th at 1235 (citing 29 U.S.C. § 153(d)).

⁴ Although Macy's does not challenge our "jurisdiction to resolve the Board's application for enforcement under 29 U.S.C. § 160(e)," we must assure ourselves of our own jurisdiction over the Board's Cross-Application for Enforcement. *NLRB v. Siren Retail Corp.*, 99 F.4th 1118, 1122, 1124 (9th Cir. 2024). Because we have jurisdiction under § 160(e) also, we may "proceed to the merits of the Board's application for enforcement." *Id.* at 1124.

in Northern California and Reno, Nevada," physically maintain and post the Board's notice "for 60 consecutive days in conspicuous places," as well as distribute the same notice electronically to employees, or if Macy's "has gone out of business or closed the facilit[ies] involved in these proceedings, . . . duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the [Company] at any time since December 7, 2020." According to the Board, the Union requested "several extraordinary remedies, including multiple notice readings by upper-level managers involved in the lockout, notice posting on the [Company's] public website, notice mailing to all of the [Company's] employees who had worked at locations where employees were locked out, and notice posting for at least three years."

The Board then denied "in part the relief sought," 29 U.S.C. § 160(f), by expressly denying the Union's request for "several extraordinary remedies . . . because the Board's traditional remedies are sufficient to effectuate the policies of the Act in this matter." *See Textile Workers Union of Am., AFL-CIO v. NLRB*, 475 F.2d 973, 974 & n.2 (D.C. Cir. 1973) (per curiam) (noting that the union was a "party aggrieved," as it "petitioned for review of the Board's refusal to order more stringent remedies"). Thus, jurisdiction over this consolidated appeal is proper.[5]

---

[5] By random selection for multidistrict litigation, *see* 28 U.S.C. § 2112(a)(1), (3), the Union's and the Company's Petitions for Review were first transferred and then consolidated here. As the alleged "*truly aggrieved party*," Macy's asserts that any remaining proceedings should be transferred to the Fifth Circuit, "wherein" Macy's "resides or transacts business[.]" 29 U.S.C. § 160(f). However, the Union as a "person

## B.  The Lockout

Under *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318 (1965), an employer may lawfully lock out employees under Section 8(a)(1) and (3) of the Act "after a bargaining impasse has been reached," if the lockout is "for the sole purpose of bringing economic pressure to bear in support of [its] legitimate bargaining position." Macy's insists that this is exactly what it did. We disagree.

Two years after *American Ship*, the Supreme Court in *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375 (1967), found that when, "after conclusion of the strike, the employer refuses to reinstate striking employees, the effect is to discourage employees from exercising their rights to organize and to strike," *id.* at 378 (citing 29 U.S.C. §§ 157, 163). The Supreme Court determined that such interference with these rights by an employer constitutes an unfair labor practice under Section 8(a)(1) and (3) of the Act. *Id.* (citing 29 U.S.C. § 158(a)(1), (3)). Accordingly, as "the employer who refuses to reinstate strikers," Macy's "is guilty of an unfair labor practice" unless it can show "legitimate and substantial business justifications" for its lockout. *Id.* (citing *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34 (1967)). Macy's does not make such a showing, and substantial evidence supports the Board's related findings.

Macy's first argues that the Board legally erred by failing to apply the so-called "*Great Dane* framework" to evaluate

---

aggrieved," could also file its petition with "the circuit wherein" the alleged unlawful lockout occurred. *Id.* Thus, we deny the Company's request, Case No. 23-188, Dkt. 16, for transfer.

the alleged Section 8(a)(3) violation. We have previously acknowledged that:

> The Supreme Court has established a framework for determining whether employer conduct is unlawfully discriminatory. Some employer conduct is so "inherently discriminatory or destructive" of employee rights that anti-union motivation is inferred. *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 227–28, 83 S. Ct. 1139, 10 L. Ed. 2d 308 (1963). If employer conduct is "inherently destructive," the Board may find an improper motive regardless of evidence of a legitimate business justification. *See NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33, 87 S. Ct. 1792, 18 L. Ed. 2d 1027 (1967). If, on the other hand, "the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight,'" and the employer establishes a legitimate and substantial business justification for its actions, there is no violation of the Act without a finding of an actual anti-union motivation. *Id.* at 34, 87 S. Ct. 1792[.]

*Fresh Fruit & Vegetable Workers Loc. 1096 v. NLRB*, 539 F.3d 1089, 1096 (9th Cir. 2008); *see also id.* ("In determining whether or not a company has violated the NLRA, the relevant inquiry is whether or not the employer's action likely discouraged union membership and was motivated by anti-union animus." (citing *Metro. Edison*, 460 U.S. at 700)). "The Supreme Court has defined

INT'L UNION OF OPERATING ENGINEERS V. NLRB      19

'inherently destructive' conduct as conduct that 'carries with it an inference of unlawful intention so compelling that it is justifiable to disbelieve the employer's protestations of innocent purpose.'" *Id.* at 1096–97 (quoting *Am. Ship*, 380 U.S. at 311–12). Under this framework, the "burden of proving justification is on the employer." *Fleetwood Trailer*, 389 U.S. at 378 (citing *Great Dane*, 388 U.S. at 34).

Upon de novo review, we conclude that the Board applied the correct legal standard when it considered *Dayton Newspapers, Inc.*, 339 N.L.R.B. 650 (2003), *enforced in relevant part*, 402 F.3d 651 (6th Cir. 2005), a prior NLRB decision in which the Board applied the *Great Dane* framework. *See, e.g.*, *Dayton Newspapers*, 339 N.L.R.B. at 664 ("An employer's unlawful refusal to reinstate economic strikers is conduct so inherently destructive of employee rights that evidence of specific antiunion motivation is not necessary to establish a violation of the Act." (citing *Great Dane*, 388 U.S. 26)). "[T]he Board is not obligated to justify its interpretation anew with every application if it has done so adequately in a previous decision." *ITT Indus., Inc. v. NLRB*, 413 F.3d 64, 70 (D.C. Cir. 2005) (citation omitted). The Board therefore did not legally err on this ground.

For a lockout to be deemed lawful, "the union must be informed on a timely basis of the employer's demands so that the union can evaluate whether to accept them and prevent the lockout." *Alden Leeds, Inc.*, 357 N.L.R.B. 84, 93 (2011) (collecting cases), *enforced*, 812 F.3d 159 (D.C. Cir. 2016). "[I]n order for employees to 'knowingly [re]evaluate their position' . . . , the employees must not only be informed that they are locked out, but they must be clearly and fully informed of the conditions they must meet to be reinstated." *Dayton Newspapers*, 339 N.L.R.B. at 656 (quoting *Eads Transfer, Inc.*, 304 N.L.R.B. 711, 712 (1991),

*enforced*, 989 F.2d 373 (9th Cir. 1993)). Relying on *Alden Leeds* and *Dayton Newspapers*, the Board concluded that Macy's violated Section 8(a)(1) and (3) of the NLRA "by locking out employees, while at the same time never clearly and fully informing them of the conditions that must be met in order to be reinstated."

Reviewing the record as a whole, we find that substantial evidence supports the Board's conclusion that Union employees were not clearly and fully informed of conditions they need to satisfy to be reinstated. As the ALJ found,

> [a]t the time Macy's locked out the [Union] engineers on December 7, neither the Union nor the strikers knew [the Company's] bargaining position. All they knew was that Macy's was refusing to allow the engineers to return to work until there was a contract in place. However, because the Final Offer had expired, and Macy's had not presented *any other bargaining proposals* to the Union, at the time of the lockout, neither the Union nor the employees were "clearly and fully informed of the *conditions* they must meet to be reinstated," *Dayton Newspapers*, 339 [N.L.R.B.] at 656, nor did they have "a clear statement of the *conditions* that [the] employees must accept to avert the lockout." *Alden Leeds, Inc.*, 357 [N.L.R.B.] at 95.

Nevertheless, Macy's counters that its lockout was justified. "An employer must reinstate an economic striker who offers unconditionally to return to work, unless the employer has a substantial and legitimate business reason for

refusing to do so." *Zapex Corp. v. NLRB*, 621 F.2d 328, 333 (9th Cir. 1980) (citations omitted); *see also Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 662 (6th Cir. 2005) ("An employer violates NLRA § 8(a)(3) and (1) if it fails to reinstate striking workers without showing a legitimate and substantial business justification." (first citing *Fleetwood Trailer*, 389 U.S. at 378; then citing *Great Dane*, 388 U.S. at 34)). Macy's asserts that the lockout was justified because it was imposed in support of its bargaining position. Macy's further argues that it "followed *Eads Transfer*'s guidance by promptly informing the Union of its lockout on December 7, the first business day after the Union offered to return to work after a three-month strike." Considering *Dayton Newspapers*, we conclude that the lockout was not justified.

In *Dayton Newspapers*, 339 N.L.R.B. 650, the Board found an unlawful lockout where union workers, after a six-month strike, gave their unconditional offer to return to work during the holiday season on Thursday, December 23, 1999, and the company refused their request for reinstatement four days later, on Monday, December 27, 1999. *See, e.g.*, *Dayton Newspapers*, 402 F.3d at 662 ("As a consequence of this refusal, the NLRB found that as of December 27, 1999, [the company] was engaged in an illegal lockout."). Before the Board in *Dayton Newspapers*, the company complained that the union's offer to return to work "came before the holidays and in the midst of [the company's] attempt to solve problems with Y2K adjustments," and that the company's "representatives involved in decision-making were not available at a moment's notice at that time of year[.]" 339 N.L.R.B. at 667. Recognizing that the Board "has the primary responsibility for balancing management's business needs

with the workers' right to be reinstated," *Dayton Newspapers*, 402 F.3d at 663 (citing *Fleetwood Trailer*, 389 U.S. at 378), the Sixth Circuit concluded that the Board "did not err in finding that after December 27, [the employer's] demands became a 'moving target' that made it ever more difficult for the [u]nion to knowingly evaluate its position and end the lockout," *id.* Simply put, "employees must know at any point in the lockout what they can do to end it." *Id.* at 662.

As the NLRB, Macy's, and the Union all agree here, at the time of the lockout there was *no* offer at all on the table— not a confusing or uncertain one or even a moving target. *See Alden Leeds, Inc. v. NLRB*, 812 F.3d 159, 164–66 (D.C. Cir. 2016) (concluding that the Board's finding that the employer violated the NLRA is supported by substantial evidence, where the employer communicated an "unclear" proposal, "failing to provide the [u]nion with a timely, clear, and complete offer setting forth the conditions necessary to avoid the lockout"). Macy's did not inform the Union of its demands or conditions in a timely, clear, and complete manner, preventing the Union members from having a fair opportunity to evaluate any bargaining proposals for either lockout or reinstatement purposes. *See id.* at 165. Worse than a "moving target" is not knowing where to aim at all. *See Dayton Newspapers*, 339 N.L.R.B. at 656.

Macy's concedes that it withdrew its Final Offer, and substantial evidence supports the Board's finding that Macy's rejected the Union's wage proposal without proffering any other bargaining proposals before the lockout. Although Macy's argues that its condition was that it required an agreement in place to end the lockout, we conclude that substantial evidence supports the Board's

finding that such an indeterminate condition did not satisfy its obligations.

The Union ended its strike and gave Macy's its unconditional offer to return to work on December 4, 2020. Two days later, on December 6, 2020, Vega sent an email to Ashmore, stating that the employees would show up to work the next morning unless they were being locked out. That afternoon, Ashmore replied that:

> [The Union's] unexpected offer, coming on a Friday afternoon after a contentious strike of over three months, implicates several administrative, logistical, and economic issues that need to be fully evaluated on our end with the input of several company employees. For that reason, the team should not return to work on Monday. *This is not a lockout . . . .*

The next morning, on Monday, December 7, 2020, at least some of the Union members reported to work. On that day, Ashmore wrote to Vega:

> We have carefully evaluated your offer to have bargaining [Union] members return to work. *We are not willing to reinstate bargaining [Union] employees until there is an agreement in place; this decision is being made in support of our bargaining position.*

Macy's was "obligated to declare the lockout *before or in immediate response* to the strikers' unconditional offer[] to return to work." *Eads Transfer*, 304 N.L.R.B. at 713 (emphasis added). It was further required to inform the

24        INT'L UNION OF OPERATING ENGINEERS v. NLRB

Union fully and clearly on the conditions necessary for employees to be reinstated. *See Dayton Newspapers*, 339 N.L.R.B. at 656. Macy's failed to satisfy either of these requirements, and instead it declared its lockout three days after the Union gave its unconditional offer to return to work *and* a day after Ashmore told Vega, "This is *not* a lockout . . . ." With such misdirection, the Union engineers would not be able to "knowingly reevaluate their position and decide whether to accept the employer's terms and . . . take other appropriate action." *Eads Transfer, Inc. v. NLRB*, 989 F.2d 373, 376 (9th Cir. 1993). Thus, we are unpersuaded that Macy's met the "guidance" set forth by *Eads Transfer*, when *Dayton Newspapers* applied just that and found that a similarly situated employer there failed to set forth its conditions clearly and fully, so "the [u]nion could not intelligently evaluate its position and obtain reinstatement." *Dayton Newspapers*, 339 N.L.R.B. at 656.

Macy's alternatively argues that its lockout was not only offensive, but also defensive. "[T]he Supreme Court's *American Ship* decision has obliterated, as a matter of law, the line previously drawn by the Board between offensive and defensive lockouts." *Evening News Ass'n*, 166 N.L.R.B. 219, 221 (1967). Accordingly, "a fundamental principle underlying a *lawful lockout* is that the Union must be informed of the employer's demands, so that the Union can evaluate whether to accept them and obtain reinstatement," *Boehringer Ingelheim Vetmedica, Inc.*, 350 N.L.R.B. 678, 679 (2007) (emphasis added) (quoting *Dayton Newspapers*, 339 N.L.R.B. at 656), regardless of whether we characterize the lockout as offensive or defensive. Moreover, a lockout that is "defensive" in nature must be justified by an intent "to avoid severe and unusual hardships." *Id.*

Before the ALJ, Macy's argued that it had "good-faith concerns" over misconduct and sabotage by the Union, especially during the holiday shopping season, which it claims justified the "defensive" lockout.  The ALJ systematically reviewed the Company's submitted evidence, including witness testimony, and ultimately concluded that Macy's provided those "post-hoc excuses" to bolster its defense and that the Company's true "motive" in locking out its employees was to "gain economic leverage so the Union would accept" its new wage proposal that it submitted to the Union on December 10, 2020.  Because the Board "carefully examined the record and [found] no basis for reversing" the ALJ's credibility findings, we conclude that the Board's "determinations are entitled to judicial deference[,]" based on its "'special expertise in drawing' inferences of credibility and unlawful motive[.]"  *Kava Holdings*, 85 F.4th at 486 (quoting *Kallmann*, 640 F.2d at 1099).  "We may not reject the ALJ's credibility determinations unless a clear preponderance of the evidence shows they are incorrect."  *Lippincott Indus., Inc. v. NLRB*, 661 F.2d 112, 114 (9th Cir. 1981) (citations omitted).  Here, the record as a whole shows that the ALJ's conclusions and the Board's reasoning about the Company's misconduct and sabotage arguments and evidence were well-supported by the articulated and admissible facts.

In sum, on this record, substantial evidence supports the Board's finding that Macy's violated the Act at the time of the lockout, where Macy's failed to inform the Union fully and clearly on the conditions necessary for employees either to be reinstated, *see Dayton Newspapers*, 339 N.L.R.B. at 656, or to avoid a lockout before one even occurred, *see Alden Leeds*, 357 N.L.R.B. at 95.  Macy's failed to timely, clearly, and fully inform the Union of the conditions

necessary (e.g., new contract offers or other bargaining
proposals) to prevent a lockout or to be reinstated, when the
Final Offer expired on October 15, 2020, and Macy's
rejected the Union's November 25, 2020 wage proposal
without providing "*any type* of counter offer" before the
lockout on December 7, 2020. In other words, Macy's failed
to meet its "burden of showing such a legitimate
justification." *Eads Transfer*, 989 F.2d at 375 (citing
*Fleetwood Trailer*, 389 U.S. at 378).

## C. Remedies

"The function of the remedy in unfair labor cases is to
restore the situation, as nearly as possible, to that which
would have occurred but for the violation." *Kallmann*,
640 F.2d at 1103 (citing *Phelps Dodge*, 313 U.S. at 194).
The Board's selected remedies are challenged on two fronts.
The Union argues that its requested additional remedies were
improperly denied, but Macy's contends that the traditional
ones were awarded in error. The NLRB counters that its
selection of remedies strikes the proper balance under its
broad discretion. The Board's "discretion in selecting
remedies is 'exceedingly broad,' and we will enforce a
remedy 'unless it represents a clear abuse of discretion.'"
*Ampersand*, 43 F.4th at 1236 (quoting *Wylie*, 934 F.2d at
236). Finding no clear abuse of discretion, we enforce the
Board's remedial order.

### 1. The Union's Requested Additional Remedies

The Board denied the Union's request for "several
extraordinary remedies" because it concluded that
"traditional remedies are sufficient to effectuate the policies
of the Act" here. The Union petitions for review of that
determination, requesting four additional remedies: (1) a
notice reading in the presence of members of management

responsible for the lockout decision; (2) an extended notice posting more than the standard sixty-day period; (3) a notice mailing to all Union members, including those who were locked out; and (4) a notice expressly explaining how Macy's violated the Act.[6] We conclude that the Board did not clearly abuse its discretion in declining to award these remedies. *See Wylie*, 934 F.2d at 236.

With respect to the first three additional remedies (a notice reading with management's presence, an extended notice posting, and a notice mailing), we observe that they are typically reserved for "cases involving respondents who have shown a proclivity to violate the Act or who have engaged in egregious or widespread misconduct." *Noah's Ark Processors, LLC*, 372 N.L.R.B. No. 80, slip op. at 4 (Apr. 20, 2023) (finding "egregious or widespread" misconduct, where the respondent's "violations seriously affected the entire unit by undermining their chosen bargaining representative, violating their right to have the [u]nion negotiate on their behalf, and demonstrating to them in no uncertain terms that the [r]espondent was willing to ignore a court order in order to violate their rights"), *enforced*, 98 F.4th 896 (8th Cir. 2024); *see also Whitesell Corp.*, 357 N.L.R.B. 1119, 1124 (2011); *HTH Corp.*, 361 N.L.R.B. 709, 714 (2014), *enforced in relevant part*, 823 F.3d 668 (D.C. Cir. 2016). Based on the record before us, we conclude that the Board did not clearly abuse its discretion, where the record does not contain evidence that Macy's is a repeat offender of the Act or engaged in such

---

[6] On appeal, the Union challenges the Board's Decision and Order only to the extent its extraordinary remedies were denied; it does not take issue with the traditional remedies that were granted and the Board's conclusion that Macy's violated the Act by unlawfully locking out employees.

egregious or widespread misconduct that warrants these extraordinary remedies.

As to the fourth additional remedy, the Union argues that the Board's notice does not "contain affirmative language expressly explaining how Macy's violated the Act." For example, the Board's notice that is required to be physically posted at the Company's facilities and electronically distributed to employees, includes the statement, "WE WILL NOT lock you out without providing you with a timely, clear, and complete offer, that sets forth the conditions necessary to avoid the lockout." Specifically, the Union requests that the Board either substitute or supplement "We will not" statements with those stating "[w]e have done or committed . . . ."[7]  We agree with the NLRB that the

---

[7] The Board's notice also includes the following "We will" statements:

> WE WILL make the locked-out employees whole for any loss of earnings and other benefits resulting from the unlawful lockout, less any net interim earnings, plus interest, and WE WILL also make them whole for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful lockout, including reasonable search-for-work and interim employment expenses, plus interest.

To further clarify the Company's actions to employees, however, the Union proposes the following amended language to the Board's notice:

> We were found by the National Labor Relations Board to have violated federal law by refusing to allow members of [the Union] to return to work and unlawfully locked them out. We have agreed to remedy this violation by reinstating all locked out employees who wish to return and by making them whole for our conduct.

Union fails to show how it clearly abused its discretion by applying its "decades-old practice of including only 'WE WILL' and 'WE WILL NOT' phrases in its notices . . . ." *See, e.g.*, *HTH Corp. v. NLRB*, 823 F.3d 668, 672 (D.C. Cir. 2016) ("In the 'notice' the officials are . . . to state 15 specific assurances in the form, 'We will' adhere to specified NLRA obligations and remedy various breaches, or 'We will not' violate the Act in a wide range of specified ways."). Accordingly, we do not find a "clear abuse of discretion," *Ampersand*, 43 F.4th at 1236 (quoting *Wylie*, 934 F.2d at 236), when the Board denied the Union's "several extraordinary remedies" because traditional ones sufficed here. Thus, we deny the Union's Petition for Review.

## 2. The Company's Challenges to the Board's Make-Whole Relief

Macy's argues that the Board erred in finding that it was liable throughout the lockout and in awarding the Union's make-whole relief pursuant to *Thryv, Inc.*, 372 N.L.R.B. No. 22, slip op. at 1 (Dec. 13, 2022) (clarifying that "make-whole relief" includes compensation "for all direct or foreseeable pecuniary harms" to affected employees), *order vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024). On June 4, 2024, the NLRB filed its Rule 28(j) letter, apprising this Court of the Fifth Circuit's May 24, 2024 opinion in *Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024), which did not address the merits of the Board's revised make-whole relief. We do so here, because "[a]s far as we can tell, this is a question of first impression for the Ninth Circuit . . . ." *United Steel Workers of Am. AFL-CIO-CLC v. NLRB*, 482 F.3d 1112, 1115 n.4 (9th Cir. 2007). We conclude that the Board did not clearly abuse its discretion in ordering make-whole relief.

### i. The Company's Liability During the Entirety of the Lockout

Macy's insists that it cured the taint of its lockout by tendering its December 10, 2020 wage proposal to the Union, three days after the lockout began. We disagree. "We review the Board's finding of taint for substantial evidence." *Denton Cnty. Elec. Coop., Inc. v. NLRB*, 962 F.3d 161, 168 (5th Cir. 2020) (citations omitted). "[T]o cure a lockout, the employer must restore the status quo ante as well as end the lockout." *Alden Leeds*, 812 F.3d at 166 (citing *Greensburg Coca-Cola Bottling Co.*, 311 N.L.R.B. 1022, 1029 (1993), *enforcement denied on other grounds*, 40 F.3d 669 (3d Cir. 1994)). "[A] lockout unlawful at its inception retains its initial taint of illegality until it is terminated *and* the affected employees are made whole." *Movers & Warehousemen's Ass'n of Metro. Wash., D.C., Inc.*, 224 N.L.R.B. 356, 357 (1976) (emphasis added), *enforced*, 550 F.2d 962, 966 (4th Cir. 1977) ("We think it dispositive of the issue that the employers here failed to dissipate the effects of their unlawful lockout."), *cert. denied*, 434 U.S. 826 (1977). Substantial evidence supports the Board's finding that the lockout's taint "was not cured when Macy's presented the Union with its new wage proposal on December 10," because that offer neither terminated the lockout nor made the affected employees whole.

We recognize, however, that Macy's may "avoid further liability if it is able to *show affirmatively* that a failure to restore the status quo ante did not adversely affect subsequent bargaining." *Alden Leeds*, 812 F.3d at 166 (emphasis added) (quoting *Greensburg Coca-Cola*, 311 N.L.R.B. at 1029). It is the Company's burden—not the Union's or the NLRB General Counsel's—"to show that its

failure to restore the *status quo ante* had no adverse impact on the subsequent collective bargaining." *Movers*, 224 N.L.R.B. at 358. This burden requires Macy's "to disentangle the consequences for which it was chargeable from those from which it [was] immune." *Id.* (quoting *NLRB v. Remington Rand*, 94 F.2d 862, 872 (2d Cir. 1938), *cert. denied*, 304 U.S. 576 (1938)). The ALJ found that Macy's failed to carry its burden to make this affirmative showing. Indeed, the ALJ observed that, at the hearing, "[n]o such evidence was presented" by Macy's.

Macy's counters that these erroneous findings "ignore[] substantial evidence that the parties negotiated in good faith after the lockout." According to Macy's, "[i]f the lockout had adversely impacted the parties' ongoing bargaining, then the [r]ecord would show . . . the Union was *forced to accept a substandard proposal* because of the lockout." However, Macy's misunderstands the standard. The fact that the record does not show the Union's acceptance of a substandard proposal does not on its own satisfy the Company's burden of showing "*no* adverse impact on the subsequent collective bargaining." *Alden Leeds*, 357 N.L.R.B. at 84 n.3 (emphasis added) (quoting *Movers*, 224 N.L.R.B. at 358). The ALJ found that even the "limited evidence in the record" relating to the subsequent bargaining indicated that the Union made concessions, which were indicative of its weakened position because of the Company's unlawful lockout. Those concessions included an offer to cap wage rates at the levels proposed in the Final Offer as well as proposals to "delete two engineer classifications from the contract, and further delete a section from the agreement that required Macy's to contribute over $500 per engineer to a training fund." Instead of addressing these concessions, Macy's maintains that no inferior offer

was accepted by the Union. These concessions represent substantial evidence in support of the ALJ's finding. "In these circumstances, without a cessation of the lockout *and* a restoration of the *status quo ante*, it is difficult to conclude that any *bargaining* which ensued was not adversely affected[.]"[8] *Movers*, 224 N.L.R.B. at 358 (first and third emphases added). We conclude that substantial evidence supports the ALJ's findings, as adopted by the Board, that Macy's unlawful lockout placed the Union in a weakened bargaining position, and that Macy's failed to satisfy its burden of showing otherwise.

### ii. The Board's Revised Make-Whole Remedial Framework

In *Thryv*, the Board "standardiz[ed] [its] make-whole relief to expressly include the direct or foreseeable pecuniary harms suffered by affected employees . . . ."[9] 372 N.L.R.B. No. 22, slip op. at 7. The Board noted that "'direct harms' are those in which an employee's 'loss was the direct result of the [employer's] illegal conduct,'" *id.* at

---

[8] Under the NLRA, when negotiations fail, there is no "compulsion to reach agreement." *Amax*, 453 U.S. at 336 (citations omitted). Macy's needed to demonstrate that the lockout "did not adversely affect subsequent *bargaining*[,]" not subsequent *contracting*. *Alden Leeds*, 812 F.3d at 166 (emphasis added) (quoting *Greensburg Coca-Cola*, 311 N.L.R.B. at 1029).

[9] In response to the Court's order requesting supplemental briefing, Macy's argues that under the Supreme Court's recent opinion in *SEC v. Jarkesy*, 603 U.S. 109 (2024), it is entitled to a jury trial on the so-called "*Thryv*" remedies." Macy's failed to raise a Seventh Amendment objection to the Board, *see* 29 U.S.C. § 160(e), and it similarly failed to raise any Seventh Amendment arguments in this Court until prompted to do so by the Court's order. We therefore decline to entertain this argument. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

13 (quoting *BRC Injected Rubber Prods., Inc.*, 311 N.L.R.B. 66, 66 n.3 (1993)), and that "foreseeable harms" are "those which the [employer] knew or should have known would be likely to result from its violation of the Act, regardless of its intentions," *id.* Macy's argues that the compensation for "direct or foreseeable pecuniary harms" as contemplated by *Thryv* would be improper "compensatory damages," "consequential damages," or "make-whole relief."[10]

"[V]esting in the Board the primary responsibility and broad discretion to devise remedies . . . , subject only to limited judicial review," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898–99 (1984) (collecting cases), Section 10(c) of the NLRA empowers the Board to "take any 'affirmative action' that 'will effectuate the policies' of the Act," *Ampersand*, 43 F.4th at 1238 (first quoting 29 U.S.C. § 160(c); then citing *Va. Elec.*, 319 U.S. at 539–40). We will not disturb the Board's remedial order, "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies

---

[10] Macy's also argues that the Board erred by retroactively applying *Thryv* to award the Union's make-whole remedy. On appeal, this argument is barred because Macy's neither raised it first in a motion for reconsideration before the Board nor showed any extraordinary circumstances here. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *see also NLRB v. Legacy Health Sys.*, 662 F.3d 1124, 1127 (9th Cir. 2011) ("Section 10(e) . . . bars judicial review of a newly minted objection to a remedial order when a party fails to move for reconsideration of the Board's *sua sponte* modification." (citations omitted)).

of the Act." *Va. Elec.*, 319 U.S. at 540. Macy's makes no such showing here.

After "careful consideration" of both its "remedial authority" and "history of addressing the effects of unfair labor practices," the Board in *Thryv* clarified and standardized its definition of "make-whole relief" to "expressly include the direct or foreseeable pecuniary harms suffered by affected employees" to "more fully effectuate the make-whole purposes of the Act." 372 N.L.R.B. No. 22, slip op. at 7. We agree that the make-whole relief provided for in *Thryv* furthers the policy of the NLRA because it is "directly targeted" at the Company's unlawful lockout and aimed at "restor[ing] the economic strength that is necessary to ensure a return to the status quo ante at the bargaining table." *Ampersand*, 43 F.4th at 1238 (alteration in original) (citation omitted).

According to Macy's (and the partial dissent), the Board's decision in *Thryv* improperly authorizes itself to award full compensatory damages. Macy's contends that "the Board lacks the authority to award damages for purportedly foreseeable financial harms." *See, e.g.*, *UAW-CIO v. Russell*, 356 U.S. 634, 642–43 (1958) ("The power to order affirmative relief under [Section] 10(c) is merely incidental to the primary purpose of Congress to stop and to prevent unfair labor practices. Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct." (citation omitted)). The NLRB "does not pursue the 'adjudication of private rights.' Rather, it 'acts in a public capacity to give effect to the declared public policy of the Act . . . .'" *EEOC v. Occidental Life Ins. Co. of Cal.*, 535 F.2d 533, 538 (9th Cir. 1976) (alteration in original) (quoting *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 362

(1940)), *aff'd*, 432 U.S. 355 (1977).  The broad "grant of remedial power" under the Act "does not authorize punitive measures, but making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces."[11] *NLRB v. Strong*, 393 U.S. 357, 359 (1969) (cleaned up).

---

[11] Even when 29 U.S.C. § 160(e) "bars our consideration of a party's objection . . . the Board is entitled to enforcement unless the Board has 'patently traveled outside the orbit of its authority.'" *Valley Hosp. Med. Ctr., Inc. v. NLRB*, 100 F.4th 994, 1000 (9th Cir. 2024) (alteration in original) (quoting *Int'l Union of Painter & Allied Trades v. J & R Flooring, Inc.*, 656 F.3d 860, 867 (9th Cir. 2011)).  Significantly, the Board remains within its orbit here because its make-whole relief is designed "solely to 'restore the status quo[,]'" so it is equitable in nature. *Jarkesy*, 603 U.S. at 123 (quoting *Tull v. United States*, 481 U.S. 412, 422 (1987) ("Remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity.")).

The Board specifically states that its "make-whole remedies do not punish bad actors, but rather implement the statutory principles of rectifying the harms actually incurred by the victims of unfair labor practices and restoring them to where they would have been but for the unlawful conduct." *Thryv*, 372 N.L.R.B. No. 22, slip op. at 11.  We agree because "[t]he instant case is not a suit at common law or in the nature of such a suit[,]" *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48 (1937); *see also Agwilines, Inc. v. NLRB*, 87 F.2d 146, 151 (5th Cir. 1936) ("Pecuniary rights are established and denied upon Board findings without a jury.  Such proceedings have been authoritatively declared to be not within the Seventh Amendment."), but more importantly Congress explicitly "entrust[ed] enforcement of statutory rights to an administrative process . . . free from the strictures of the Seventh Amendment," *Curtis v. Loether*, 415 U.S. 189, 195 (1974); *see, e.g.*, *Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 461 (1977) ("[Congress] created a new cause of action, and remedies therefor, unknown to the common law, and

We conclude that the Board's invocation of *Thryv*'s make-whole relief here vindicates a public right. *See Va. Elec.*, 319 U.S. at 543 ("The instant reimbursement order is not a redress for a private wrong. Like a back pay order it does *restore to the employees in some measure what was taken from them* because of the [c]ompany's unfair labor practices." (emphasis added)). "The fact that these proceedings (may) operate to confer an incidental benefit on

---

placed their enforcement in a tribunal supplying speedy and expert resolutions of the issues involved. The Seventh Amendment is no bar . . . to their enforcement outside the regular courts of law."). As here, the Seventh Amendment "has no application to cases where recovery of money damages is an incident to equitable relief even though damages might have been recovered in an action at law." *Jones & Laughlin*, 301 U.S. at 48 (citations omitted); *see also Curtis*, 415 U.S. at 194 ("[J]ury trials would be incompatible with the whole concept of administrative adjudication and would substantially interfere with the NLRB's role in the statutory scheme."). That any make-whole remedy must be "sufficiently tailored to the actual, compensable injuries suffered," *Sure-Tan*, 467 U.S. at 901, contrary to the partial dissent's view, also does not equate to the improper "adjudication or vindication of private rights," *Haleston Drug Stores v. NLRB*, 187 F.2d 418, 420 (9th Cir. 1951), *cert. denied*, 342 U.S. 815 (1951); *see also Amalgamated Util. Workers v. Consol. Edison Co. of N.Y.*, 309 U.S. 261, 269–70 (1940) ("It is the Board's right to make that order that the court sustains. The Board seeks enforcement as a public agent, not to give effect to a 'private administrative remedy'. Both the order and the decree are aimed at the prevention of the unfair labor practice."). Instead, it merely underscores how the remedy is "an incident to [permissible] equitable relief," *Jones & Laughlin*, 301 U.S. at 48, which "eschews mechanical rules and depends on flexibility," *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975) (cleaned up). Accordingly, the Seventh Amendment is not implicated because "[i]n this case, the remedy is all but dispositive." *Jarkesy*, 603 U.S. at 123; *see also id.* at 120 ("The threshold issue is whether this action implicates the Seventh Amendment." (applying *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) and *Tull*, 481 U.S. 412)).

private persons does not detract from this public purpose." *Occidental Life*, 535 F.2d at 538 (citation omitted). To the extent that the Board's make-whole relief "somewhat resemble[s] compensation for private injury," that compensation is merely incidental to "the effectuation of the policies of the Act" because the remedy is primarily "designed to aid in achieving the elimination of industrial conflict[,]" vindicating "public, not private rights." **12**

---

[12] On December 27, 2024, the Third Circuit issued its opinion in *NLRB v. Starbucks Corp.*, --- F.4th ----, No. 23-1953, 2024 WL 5231549 (3d Cir. Dec. 27, 2024), granting the Board's petition to enforce its order, yet vacating the *Thryv* remedies for exceeding the Board's authority under the NLRA. Unlike the partial dissent, we do not view *Starbucks* as wholly in conflict with today's opinion. Like the Third Circuit, we agree and recognize that the NLRB has long ordered, and still may order, monetary relief akin to backpay. *Starbucks*, --- F.4th ----, 2024 WL 5231549, at *11–12. We also agree that any make-whole relief must be equitable in nature. *Id*. As the Third Circuit acknowledges, any monetary relief ordered by the NLRB must be a form of restitution addressing the *result* of the employer's violation of the NLRA. *See, e.g.*, *id.* at *11 ("The Board can still award monetary relief based on what the employer withheld as a *result* of an unfair labor practice." (emphasis added)); *accord* Partial Dissent at 50; *see also Phelps Dodge*, 313 U.S. at 198 ("[O]nly actual losses should be made good[.]").

However, to the extent that the Third Circuit's opinion could be read to invalidate any form of monetary relief because it "*resembles* an order to pay damages," we disagree. *Starbucks*, --- F.4th ----, 2024 WL 5231549, at *12 (emphasis added) (citing *Damages*, Black's Law Dictionary (12th ed. 2024) (defining "damages" as "[m]oney . . . ordered to be paid to[] a person as compensation for loss or injury")). Resemblance alone cannot be dispositive, where Congress's express grant of broad authority to the NLRB to fashion appropriate remedies,

*Va. Elec.*, 319 U.S. at 543 (first citing *Agwilines*, 87 F.2d at 150–51; then citing *Phelps Dodge*, 313 U.S. 177). After all, the NLRA's overriding policy is "industrial peace." *Fall*

---

*see* 29 U.S.C. § 160(c), and those remedies' nature and purpose, indicate that the make-whole relief here operates "[l]ike a back pay order" that

> does restore to the employees in some measure what was taken from them because of the Company's unfair labor practices. In this both these types of monetary awards *somewhat resemble compensation for private injury*, but it must be constantly remembered that both are *remedies created by statute*—the one explicitly and the other implicitly in the concept of effectuation of the policies of the Act—which are *designed to aid in achieving the elimination of industrial conflict. They vindicate public, not private rights*.

*Va. Elec.*, 319 U.S. at 543 (emphases added) (first citing *Agwilines*, 87 F.2d at 150–51; then citing *Phelps Dodge*, 313 U.S. 177); *see also Russell*, 356 U.S. at 643 (quoting the same). The *Thryv* remedies are therefore like a backpay order, serving to effectuate the policies of the Act by eliminating industrial conflict and giving something akin to restitution. *See Curtis*, 415 U.S. at 197 ("[C]ourts of appeals have characterized back pay as an integral part of an equitable remedy, a form of restitution."); *see also Restitution*, Black's Law Dictionary (12th ed. 2024) (defining "restitution" as "[r]eturn or restoration of some specific thing to its rightful owner or status"). Such remedies only incidentally compensate employees to "insure meaningful bargaining," *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964), and to "restore the economic strength that is necessary to ensure a return to the status quo ante at the bargaining table," *Ampersand*, 43 F.4th at 1238 (cleaned up) (citation and alteration omitted); *see also supra* note 11. "For this reason it is erroneous to characterize" the *Thryv* remedies "as penal or as the adjudication of a mass tort. It is equally wrong to fetter the Board's discretion by compelling it to observe conventional common law or chancery principles in fashioning" the make-whole relief here. *Va. Elec.*, 319 U.S. at 543.

INT'L UNION OF OPERATING ENGINEERS v. NLRB          39

*River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 38 (1987) (quoting *Brooks v. NLRB*, 348 U.S. 96, 103 (1954)).

Accordingly, compensation for "direct or foreseeable pecuniary harms," as defined in *Thryv*, would allow for "a restoration of the situation, as nearly as possible, to that which would have obtained but for" the unlawful lockout here. *Phelps Dodge*, 313 U.S. at 194. As such, the Board's remedial order is not "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act."[13]  *Va. Elec.*, 319 U.S. at 540. We will not disturb the Board's remedial order here, where "both the terms of the Act and the case law construing the Act support the Board's action in this case." *King Soopers, Inc. v. NLRB*,

---

[13] To the extent that Macy's argues that "*Thryv* grants the Board unfettered discretion to determine whether a pecuniary loss is direct or foreseeable," we disagree because the Supreme Court has previously acknowledged that "Section 10(c) . . . was *intended* to give the National Labor Relations Board broad authority to formulate appropriate remedies[,]" *Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 446 n.26 (1986) (emphasis added), and that:

> [I]n the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an *infinite variety of specific situations*. Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration.

*Phelps Dodge*, 313 U.S. at 194 (emphasis added); *see also Va. Elec.*, 319 U.S. at 539 (emphasizing that the Board's remedial power "is not limited to the illustrative example of one type of permissible affirmative order," such as backpay, and cautioning that the "particular means by which the effects of unfair labor practices are to be expunged are matters 'for the Board not the courts to determine'" (first citing *Phelps Dodge*, 313 U.S. at 187, 189; then quoting *Machinists*, 311 U.S. at 82)).

859 F.3d 23, 38 (D.C. Cir. 2017) (collecting cases); *see also id.* at 37 ("The Board is entitled to considerable deference in crafting remedies for unfair labor practices, and the reasons given by the Board to justify the new make-whole remedial framework pass muster.").[14]

Macy's also contends that the "pecuniary damages that [the Board] seeks to award are the wolf of consequential damages in the sheep's clothing of 'make-whole' relief." Macy's asserts that this kind of relief here would be prohibited consequential damages under *United States v. Burke*, 504 U.S. 229 (1992), which is a tax consequence case relating to an action under Title VII of the Civil Rights Act of 1964 for sex-based discrimination in the payment of salaries. Although not controlling in the NLRA context, *Burke* demonstrates how the Board's make-whole relief under *Thryv* is appropriate here, contrary to the Company's assertion. For the below reasons, we find no reason to disturb the Board's remedy, when it serves to "more fully effectuate the make-whole purposes of the Act." *Thryv*, 372 N.L.R.B. No. 22, slip op. at 7.

The Supreme Court in *Burke* distinguished between make-whole relief and damages recoverable under tort law. It considered this distinction in the context of determining

---

[14] This is not *Chevron* deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Rather, it is a reflection of the discretion afforded by Congress to allow the Board to award remedies it deems fit to effectuate policies of the Act. *See Phelps Dodge*, 313 U.S. at 194 ("Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.").

whether a settlement payment relating to a backpay claim arising under Title VII would be excludable from gross income under the federal Internal Revenue Code ("IRC"), as "damages received . . . on account of personal injuries." *Burke*, 504 U.S. at 230 (alteration in original) (quoting 26 U.S.C. § 104(a)(2)). To qualify for exclusion from gross income under the IRC, the respondents had to show that Title VII redressed a tort-like personal injury. *Id.* at 237. The Supreme Court observed "one of the hallmarks of traditional tort liability is the availability of a broad range of damages" that are unavailable in both Title VII and NLRA contexts. *Id.* at 235. Under tort law, one may be awarded sums "*larger than the amount necessary* to reimburse actual monetary loss sustained or even anticipated by the plaintiff," as well as those amounts redressing "intangible elements of injury that are 'deemed important, even though *not pecuniary* in [their] immediate consequence[s].'" *Id.* (alterations in original) (emphases added) (quoting D. Dobbs, Law of Remedies 136 (1973)). *Thryv* does not provide such relief. After all, relief under either the NLRA or "Title VII focuses on 'legal injuries of an economic character[.]'" *Id.* at 239 (quoting *Albemarle Paper*, 422 U.S. at 418); *see also Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 188 (1973) ("[A]n order requiring reinstatement and backpay is aimed at 'restoring the economic status quo that would have obtained but for the company's wrongful refusal to reinstate . . . .'" (quoting *NLRB v. J.H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 263 (1969))).

As the partial dissent points out, the Supreme Court in *Burke* also observed that Title VII "restor[es] victims, through backpay awards and injunctive relief, to the wage and employment positions they would have occupied absent

the unlawful discrimination[,]" but not for *nonpecuniary* harms, including "other traditional harms associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or *other* consequential damages (*e.g.*, a ruined credit rating)." *Burke*, 504 U.S. at 239 (emphasis added) (citation omitted). Macy's argues that these "express limitations in *Burke* apply with equal force to Section 10(c) of the Act," because Title VII's backpay provision was expressly modeled on the NLRA's. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848–49 (2001) (noting that Title VII's backpay provision, 42 U.S.C. § 2000e-5(g)(1), "closely tracked the language" of the Act's backpay provision, 29 U.S.C. § 160(c), which gives courts "guidance as to the proper meaning of the same language"). Even if we accept this comparison, the Board's make-whole relief is consistent with both Title VII's, which it need not follow in this context, and the NLRA's, which it must. For example, "Congress directed the thrust of [Title VII] to the *consequences* of employment practices," *Albemarle Paper*, 422 U.S. at 422 (emphasis added) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)), with a "clear purpose . . . to bring an end to the proscribed discriminatory practices and to *make whole*, in a *pecuniary fashion*, those who have suffered by it," *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 720 (7th Cir. 1969) (emphases added), *as amended on denial of reh'g* (Oct. 29, 1969). Similarly, under the NLRA, the Board's "power to command affirmative action is remedial, not punitive, and is to be exercised in aid of the Board's authority to restrain violations and as a means of *removing or avoiding the consequences of violation* where those consequences are of a kind to thwart the purposes of the Act." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 236 (1938) (emphasis

added); *see also Albemarle Paper*, 422 U.S. at 417–18 ("If employers faced only the prospect of an injunctive order, they would have little incentive to shun practices of dubious legality. It is the reasonably certain prospect of a backpay award that provides the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices . . . ." (cleaned up)); *Thryv*, 372 N.L.R.B. No. 22, slip op. at 11 (articulating similar principles).

Moreover, the Board acknowledged that it "will *not* issue remedial orders for harms which are unquantifiable, speculative, or nonspecific." *Thryv*, 372 N.L.R.B. No. 22, slip op. at 12 (emphasis added) (citing *Nortech Waste*, 336 N.L.R.B. 554, 554 n.2 (2001)). In *Thryv*, the Board addressed that any make-whole relief comprised of direct or foreseeable pecuniary harms will be fully litigated in a later compliance proceeding. *See id.* at 11–12. The NLRB General Counsel will have to prove whether any such relief is "not speculative," and that it is "specific and easily ascertained." *Nortech Waste*, 336 N.L.R.B. at 554 n.2. We conclude that a remedial framework that "specifically leav[es] to the compliance stage of the proceeding the question of whether the employees incurred" direct or foreseeable pecuniary harms "attributable" to the Company's unlawful lockout, *id.*, is not a clear abuse of discretion here, *see, e.g.*, *Sure-Tan*, 467 U.S. at 900 ("[A] backpay remedy must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practices." (citation omitted)); *Phelps Dodge*, 313 U.S. at 198 ("[O]nly actual losses should be made good[.]").

Under the NLRA, Congress's grant of remedial power entrusts the Board to make "workers whole for losses

suffered on account of an unfair labor practice . . . ." *Strong*, 393 U.S. at 359 (quoting *Phelps Dodge*, 313 U.S. at 197); *see also id.* ("Back pay is one of the *simpler and more explicitly authorized* remedies utilized to attain this end." (emphasis added)).  We conclude that the Board's award of compensation "for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful lockout, including reasonable search-for-work and interim employment expenses," is within the Board's broad discretion of what "can fairly be said to effectuate the policies of the Act," *Va. Elec.*, 319 U.S. at 540, by restoring "the situation, as nearly as possible, to that which would have occurred but for the violation," *Kallmann*, 640 F.2d at 1103 (citing *Phelps Dodge*, 313 U.S. at 194).  The Board's "order clearly falls within the general purpose of making the employees whole, and thus restoring the economic status quo that would have obtained but for" the Company's unlawful lockout.  *J.H. Rutter-Rex Mfg.*, 396 U.S. at 263.  "Imposing such remedies, designed to respond directly to an unfair labor practice, falls squarely within the heartland of the NLRB's delegated powers."  *Ampersand*, 43 F.4th at 1238 (cleaned up). Accordingly, on the record as a whole, "we have no reason to find that the Board's decision to change its remedial framework is 'a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'"  *King Soopers*, 859 F.3d at 39 (quoting *Fibreboard Paper*, 379 U.S. at 216).

Therefore, to the extent that Macy's challenges the Board's revised make-whole remedial framework, we deny its Petition for Review.

## D.  The Circumstances Here Disclosed

The partial dissent contends that the Board's "actions were arbitrary and capricious and unsupported by the record."  Partial Dissent at 50.  However, applying the law as it is, not as what the partial dissent wishes it to be, reveals that they were simply not.  *See Danielson v. Inslee*, 945 F.3d 1096, 1103 (9th Cir. 2019); *see also Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 694 (1st Cir. 1984).  Our task is to "evaluate the entire record and uphold the NLRB if a reasonable jury could have reached the same conclusion, even if we would justifiably have made a different choice under de novo review."  *Int'l All. of Theatrical Stage Emps., Loc. 15 v. NLRB*, 957 F.3d 1006, 1013 (9th Cir. 2020) (emphasizing the standard of review) (cleaned up).  For example, while it is possible to infer that the Company's lockout could have been informed by "enormous logistical difficulties," Partial Dissent at 77, the weighing of such evidence belongs to the Board, which "has special expertise in drawing inferences of credibility and unlawful motive, and [whose] determinations are entitled to judicial deference," *Kava Holdings*, 85 F.4th at 486 (cleaned up).  Here, substantial evidence supports the Board's consideration and conclusion of the credibility and value of such evidence.  *See Int'l All. of Theatrical Stage Emps.*, 957 F.3d at 1013 ("Evidence is substantial when a reasonable mind might accept it as adequate to support a conclusion—even if it is possible to draw a contrary conclusion from the evidence." (cleaned up)); *see also* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole *shall be conclusive*." (emphasis added));  *Starbucks*,  --- F.4th ----, 2024 WL 5231549, at *6 n.2 (noting that a judge on the

panel doubted the NLRB's factual conclusions, but he recognized that because there is "more than a scintilla" of evidence to support the NLRB's "contrary conclusions," the court is "bound by the substantial evidence standard of review," so it is barred from "explor[ing] the other ways of reading [the] record" (citation omitted)).

Similarly, while the partial dissent raises potentially significant points about the scope of make-whole relief under *Thryv*, Macy's neither properly challenged the application of *Thryv* or the Seventh Amendment to this case nor showed "extraordinary circumstances" to warrant consideration of these issues. *See supra* notes 9–10; *see also* 29 U.S.C. § 160(e); *Legacy Health Sys.*, 662 F.3d at 1127; *cf. Starbucks*, --- F.4th ----, 2024 WL 5231549, at \*12 (holding that the employer's "statutory interpretation and Seventh Amendment challenges were not forfeited"). More critically, the Board has yet to order specific forms of relief, including those the partial dissent lambasts as "virtually unlimited." *See* Partial Dissent at 56. Indeed, the Board must still establish, in a later proceeding, how any make-whole relief it seeks is "sufficiently tailored to the actual, *compensable* injuries suffered" by the employees in this case. *Sure-Tan*, 467 U.S. at 901 (emphasis added).

It also bears repeating that "[i]n fashioning an appropriate remedy to address the substantial unfair labor practices in this case, the Board was acting at the 'zenith' of its discretion." *Fallbrook Hosp. Corp. v. NLRB*, 785 F.3d 729, 738 (D.C. Cir. 2015) (quoting *Niagara Mohawk Power Corp. v. Fed. Power Comm'n*, 379 F.2d 153, 159 (D.C. Cir. 1967)); *accord* 29 U.S.C. § 160(c) (authorizing the NLRB "to take such affirmative action . . . as will effectuate the policies" of the Act). Additionally, there has simply been "no showing that the

Board's order restoring the status quo ante to insure meaningful bargaining is not well designed to promote the policies of the Act. Nor is there evidence which would justify disturbing the Board's conclusion that the order would not impose an undue or unfair burden on the Company." *Fibreboard Paper*, 379 U.S. at 216. There has also been no meaningful showing that as a result of an unfair labor practice any make-whole relief in this case "exceed[s] what the employer unlawfully withheld[,]" or is not "closely tied to the equitable remedy of backpay." *Starbucks*, --- F.4th ----, 2024 WL 5231549, at *11–12; *see also supra* note 13; *accord* Partial Dissent at 50.

In sum, we "decide[d] only the case before us and sustain[ed] the power of the Board" to tailor remedies that "effectuate the statutory purpose" behind the National Labor Relations Act "*under the circumstances here disclosed*." *Va. Elec.*, 319 U.S. at 543, 545 (emphasis added); *see also Intalco Aluminum Corp. v. NLRB*, 417 F.2d 36, 42 n.17 (9th Cir. 1969) (acknowledging that in *Virginia Electric*, the Supreme Court found that it "need not examine the various situations in those cases 'or consider hypothetical possibilities'" (quoting *Va. Elec.*, 319 U.S. at 545)); *NLRB v. Reed & Prince Mfg. Co.*, 118 F.2d 874, 891 (1st Cir. 1941) ("We therefore think that *under the circumstances here disclosed* the broader prohibition as appears in . . . the Board's order is within the discretion of the Board and should be enforced." (emphasis added)), *cert. denied*, 313 U.S. 595 (1941).

## IV. CONCLUSION

We have considered the Union's and the Company's remaining arguments and find them unpersuasive. For the foregoing reasons, we **DENY** both the Union's and the

Company's Petitions for Review, and we **GRANT** the Board's Cross-Application for Enforcement of its final Order.

**PETITIONS FOR REVIEW DENIED; CROSS-APPLICATION FOR ENFORCEMENT GRANTED; ORDER ENFORCED.**

---

BUMATAY, Circuit Judge, dissenting in part:

This case involves the fallout from a lengthy labor dispute between Macy's and the International Union of Operating Engineers, Local 39 ("Union"), which represents some of the retailer's engineers and craftsmen. After extensive negotiations over a new collective bargaining agreement, Macy's gave the Union its best and final offer. The Union rejected that offer and went on strike. During the three-month strike, Macy's accused Union members of harassing its customers and employees and sabotaging its facilities. The Union then made a surprise unconditional offer to return to work—shortly before the close of business on a Friday evening. Macy's pleaded for time to respond to the offer, but the Union refused. So when the Union members showed up for work on Monday—the next workday—Macy's did not let them start working and locked them out. Two days later, Macy's gave the Union a new proposal to end the dispute and lockout. The Union again rejected Macy's offer, and the two sides never reached an agreement.

Enter the National Labor Relations Board. The Board's in-house prosecutor charged Macy's with an "unfair labor practice." After a hearing, a Board Administrative Law Judge ("ALJ") systematically rejected each of Macy's

defenses and found that Macy's violated the National Labor Relations Act because it waited a whole *two days* before it gave a new offer to the Union. As punishment, the ALJ ordered Macy's to make the Union members whole for any losses of pay and benefits that they may have suffered because of the lockout. *Macy's, Inc.*, 372 NLRB No. 42, at 21 (2023). On review, the Board agreed with the ALJ that Macy's violated the Act. But it rejected the ALJ's remedy *because it didn't go far enough*. Instead, the Board ordered Macy's to "also compensate the employees for any other direct *or* foreseeable pecuniary harms incurred as a result of the unlawful lockout . . . regardless of whether these expenses exceed interim earnings." *Id.* at 1 n.2 (emphasis added). And because the Union and Macy's still haven't come to an agreement, Macy's must compensate the Union's members for ongoing harms accumulating to this day—more than four years since the lockout.

But the Board has no authority to order this type of monetary relief. Until two years ago, the Board had never claimed the authority to award consequential damages, like the ones ordered against Macy's. *See Thryv, Inc.*, 372 NLRB No. 22 (2022), *overruled on different grounds*, *Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024). Indeed, the Act restricts the Board to ordering only "back pay" and "affirmative action . . . as will effectuate the policies of" the Act. *See* 29 U.S.C. § 160(c). Somehow, the Board has transformed this limited statutory grant into something that covers credit card debt, withdrawals from retirement accounts, car loans, mortgage payments, childcare, immigration expenses, and medical expenses. *See, e.g., Thryv, Inc.*, 372 NLRB No. 22, at 9. Never mind that granting the Board this authority would violate the Seventh Amendment. We create a needless circuit split in affirming

the Board's power grab. *See NLRB v. Starbucks Corp.*, ---
F.4th ---, 2024 WL 5231549, at \*12 (3d. Cir. 2024) ("While
the Board can certainly award some monetary relief to the
employees, that relief cannot exceed what the employer
unlawfully withheld.").

And we never should have gotten this far. The Board's
actions were arbitrary and capricious and unsupported by the
record. *See Valley Hosp. Med. Ctr., Inc. v. NLRB*, 100 F.4th
994, 1002 (9th Cir. 2024) (noting the standard of review
under 5 U.S.C. § 706(2)(A)). The Board wrongly concluded
that Macy's needed to have a detailed proposal on the table
within one working day of the Union's offer of return to
justify its lockout. This rule is as novel as it is unrealistic. It
contradicts both Ninth Circuit precedent and the Board's
own precedent. The Board also ignored evidence that the
lockout could have been justified as defensive given Macy's
reasonable concerns of sabotage and misconduct.

While I agree with denying the Union's petition for
review, I respectfully dissent from the denial of Macy's
petition for review and from the grant of the Board's
application for enforcement.

## I.

## The Board Lacks Authority to Order Foreseeable or Consequential Damages

### A.

The Board is a limited-authority agency with a limited
purpose and limited enforcement mechanisms. "The Board
is not a court; it is not even a labor court; it is an
administrative agency charged by Congress with the
enforcement and administration of the federal labor laws."
*Shepard v. NLRB*, 459 U.S. 344, 351 (1983). Simply, the

Board is not in the business of the "adjudication of private rights." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 193 (1941) (simplified). It's only function is to "safeguard[] and encourage[] the right of self-organization." *Id.* Thus, the Board was not established to award "full compensatory damages for injuries caused by wrongful conduct." *Int'l Union, United Auto., Aircraft & Agr. Implement Workers of Am. (UAW-CIO) v. Russell*, 356 U.S. 634, 642–43 (1958). Instead, its authority to order relief is "merely incidental to the primary purpose of Congress to stop and to prevent unfair labor practices." *Shepard*, 459 U.S. at 352. Given this, the Board can't award consequential or foreseeable damages, which go beyond compensatory damages and include damages for harms that do not flow directly from an unfair labor practice. *See* Black's Law Dictionary (12th ed. 2024) (defining "consequential damages" as those that "do not flow directly and immediately from an injurious act but that result indirectly from the act").

Despite its limited authority, the Board has assumed powers to award not only compensatory damages but all *foreseeable* damages—a species of consequential damages. In *Thryv*, the Board concluded that a company violated the Act by unilaterally laying off six union employees and refusing to comply with the union's information requests. 372 NLRB No. 22, at 3–4. Rather than apply its standard remedy to the case, the Board expanded its authority to award monetary relief. The Board concluded "that in all cases in which [its] standard remedy would include an order for make-whole relief, the Board will expressly order that the respondent compensate affected employees for *all direct or foreseeable pecuniary harms* suffered as a result of the respondent's unfair labor practice." *Id.* at 13 (emphasis added). The Board then defined "direct harms" as monetary

losses that are the direct result of an unfair labor practice. *Id.*
In contrast, it defined "foreseeable harms" as "those which
the [employer] knew or should have known would be likely
to result from its violation of the Act, regardless of its
intentions." *Id.* The Board has *never* included such broad,
indirect harm as part of its make-whole remedy. *See id.* at
18 (Kaplan & Ring, dissenting in part).

So what's covered by "direct or foreseeable harm"?
Quite a lot, it turns out. While the Board declined "to
enumerate all the pecuniary harms that may be considered
direct or foreseeable in the myriad of unfair labor practices
that come before us[,]" they made clear it's very expansive.
*Id.* at 12. The Board explained that foreseeable harms
include indirect costs, "such as out-of-pocket medical
expenses, credit card debt, or other costs simply in order to
make ends meet." *Id.* at 9. The Board also made clear that
"penalties" related to "early withdrawals from [a] retirement
account," "loan or mortgage payments," and "transportation
or childcare costs" could all be fair game. *Id.* And this list
didn't even represent the "limits of the Board's statutory
remedial authority," it's only the "*minimum*" for make-whole
relief. *Id.* at 7 n.10 (emphasis added). The Board's General
Counsel added even more costs to the list: unreimbursed
tuition payments, job search costs, day care costs, specialty
tool costs, utility disconnection/reconnection fees,
relocation/moving costs, legal representation costs in
eviction proceedings, and expenses resulting from a change
in immigration status. Office of the General Counsel
Memorandum GC 24-04, Securing Full Remedies for All
Victims of Unlawful Conduct (Apr. 8, 2024).[1] So now

---

[1] Available at https://perma.cc/P8CN-HZBS.

everything is on the table under the Board's newly claimed authority—the only limit is the Board's imagination.

Of course, the Board denied that these broad remedies make up "consequential damages." But that's hard to believe given that the Board specifically invited briefing on whether it should adopt consequential damages as part of its make-whole remedy in that very case. *Thryv, Inc.*, 372 NLRB No. 22, at 6 n.8, 8. Indeed, the Board's Chairman has labeled as "consequential damages" harms such as late fees on credit cards, penalties for early withdrawals from retirement accounts, and the loss of a vehicle or home if an employee is unable to make loan or mortgage payments. *See Voorhees Care & Rehab. Ctr*., 371 NLRB No. 22, 4 n.14 (2021). Perhaps recognizing its overreach, the Board pretends its adoption of a "foreseeable damages" standard is something different than consequential damages. Yet the only distinction the Board draws between the two is observing that "consequential damages" is "a term of art used to refer to a specific type of legal damages awarded in other areas of the law." *Thryv, Inc.*, 372 NLRB No. 22, at 8. Yes, it's a term of art for tort and contracts law, but the Board can't simply put lipstick on the pig and call it "foreseeable damages." That doesn't change its legal nature—it's still consequential damages no matter how it's spun. And, as the Board admits, consequential damages are a remedy for private rights—not the sort of thing that the Board may vindicate.

The Board's remedy proved to be too much for its entire membership to stomach. Two members dissented. They explained that the Board's new remedial standard "would permit recovery for any losses indirectly caused by an unfair labor practice, regardless of how long the chain of causation may stretch from unfair labor practice to loss, whenever the

loss is found to be foreseeable." *Id.* at 16 (Kaplan & Ring, dissenting in part). They warned that "this standard opens the door to awards of speculative damages that go beyond the Board's remedial authority." *Id*. First, they noted that "'foreseeability' is a central element of tort law" and that "[a]ny attempt to address tort claims in a Board proceeding obviously runs headlong into the Seventh Amendment's guarantee of the right to have such claims tried before a jury." *Id.* at 18–19. Second, the dissent observed that the Board's foreseeable damages remedy "go[es] well beyond tort law," because the remedy wasn't even limited by proximate cause. *Id.* at 19. So, to the dissenting members, the Board's newly minted power is *even greater* than the power to award consequential damages.

## B.

The Board exceeded its authority in ordering Macy's to pay foreseeable or consequential damages. First, nothing in the text of the Act authorizes such expansive authority for the Board. Second, reading the Act to grant these broad remedies, as the dissenting Board members noted, puts the Board in conflict with the Seventh Amendment.

## 1.

Let's start with the Board's statutory authority to fashion remedies for unfair labor practices. To remedy an unfair labor practice, Congress granted the Board authority to:

> [I]ssue and cause to be served on . . . [a] person [who committed the unfair labor practice] an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or

> without back pay, as will effectuate the
> policies of this subchapter.

29 U.S.C. § 160(c). Thus, in all cases, the Board's remedial
authority must further the policies of the Act, which are to:

> [E]liminate the causes of certain substantial
> obstructions to the free flow of commerce
> and to mitigate and eliminate these
> obstructions when they have occurred by
> encouraging the practice and procedure of
> collective bargaining and by protecting the
> exercise by workers of full freedom of
> association, self-organization, and
> designation of representatives of their own
> choosing, for the purpose of negotiating the
> terms and conditions of their employment or
> other mutual aid or protection.

29 U.S.C. § 151.

While an admittedly broad policy statement, it only
provides for vindication of public rights—not of private
rights, which consequential damages are designed to
remedy. Consistent with that understanding, the Supreme
Court recognized long ago that the Board's functions are
"narrowly restricted to the protection and enforcement of
public rights" and that it thus has no role to play in the
"adjudication of private rights." *Nat'l Licorice Co. v. NLRB*,
309 U.S. 350, 362–63 (1940). So even with the Board's
power to fashion affirmative acts to carry out federal labor
policies, it can't order relief that is "a patent attempt to
achieve ends other than those which can fairly be said to
effectuate the policies of the Act." *Va. Elec. & Power Co. v.*

*NLRB*, 319 U.S. 533, 540 (1943).  For example, the Board isn't vested with "a virtually unlimited discretion to devise punitive measures" and it can't "prescribe penalties or fines which the Board may think would effectuate the policies of the Act." *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 11 (1940).  As Judge Learned Hand said long ago, "[t]he 'affirmative action' which the section contemplates must be remedial, and not punitive or disciplinary . . . and the order, qua payments, must therefore be confined to restitution for the wrong done, however widely that should be conceived." *NLRB v. Leviton Mfg. Co*., 111 F.2d 619, 621 (2d Cir. 1940). Thus, the Board's authority begins and ends with the enforcement of public rights—its role is not to vindicate the private rights of aggrieved employees.

Even so, the Board expressly sought to vindicate private rights in its *Thryv* decision.  In adopting its consequential damages or foreseeable harm regime, its goal was to "rectify[] the harms actually incurred by the victims of unfair labor practices." *Thryv, Inc.*, 372 NLRB No. 22, at 11.  In justifying the broad remedy, the Board noted the need to assist "*wrongfully-terminated employees* [who] may incur 'expenses for transportation, room, and board'" related to their termination.  *Id.* at 7 (simplified) (emphasis added). This is no different than vindicating the private right against wrongful termination, which falls outside the Act's statutory policies.

The Board also acknowledged its new remedy has a compensatory—rather      than      restitutionary—purpose: "making employees whole should include, at least, *compensating* them for direct or foreseeable pecuniary harms resulting from the [employer's] unfair labor practice." *Id.* at 8 (emphasis added).  And the Board reads "foreseeable harms" as broadly as possible—it includes medical

expenses, credit card debts and fees, car payments, mortgage payments, childcare costs, and transportation costs. *See id.* at 9. These rectify *individualized* private harms at law. As the Court has said, "one of the hallmarks of traditional tort liability is the availability of a broad range of damages to compensate the plaintiff 'fairly for injuries caused by the violation of his legal rights.'" *United States v. Burke*, 504 U.S. 229, 235 (1992) (simplified). All this shows that the Board's make-whole remedy goes far beyond "effectuat[ing] the policies" of the Act. *See* 29 U.S.C. § 160(c). Instead, it vindicates private rights. And the Act "limits the Board's remedial authority to equitable, not legal, relief." *Starbucks Corp.*, 2024 WL 5231549, at \*11.

Besides violating the policies of the Act, the Board's new remedy also violates the text of the Act. The Board can issue a "cease and desist" order and instruct the "reinstatement of employees with or without back pay." 29 U.S.C. § 160(c). None of these express grants of power encompass the award of foreseeable or consequential damages. Under the Board's "cease and desist" authority, it may enjoin "future conduct" that would violate the Act. *See NLRB v. C.E. Wylie Const. Co.*, 934 F.2d 234, 237 (9th Cir. 1991). Yet injunctive power doesn't authorize the award of the damages it seeks now. And the power to authorize "back pay" doesn't provide the Board with the ability to award consequential damages. In this context, "back pay" means pay that is unpaid but due. *See* A Dictionary of Modern American Usage at 17 (1935) (defining "back pay" as an "arrears of a pay"); Webster's Collegiate Dictionary at 59 (1936) (defining "arrears" as "that which is unpaid but due"). Together, the Act authorizes the Board to remedy violations of unfair labor practices by restoring wages and employment positions that employees would have otherwise received in the absence of unfair labor

practices. But such injunctive relief and back pay awards don't provide the textual hook for the expansive remedy sought here.

However broadly it's possible to read the Board's remedial authority, Congress confirmed its narrow powers through its Taft–Hartley amendments. *See* Labor Management Relations Act of 1947, Pub. L. No. 80-101, 101, 61 Stat. 136, 147. In 1947, Congress amended § 160(c) and precluded the Board from awarding remedies to an employee "who had been discharged because of misconduct." *See Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 217 (1964). After the amendment, § 160(c) then said,

> No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or *the payment to him of any back pay*, if such individual was suspended or discharged for cause.

29 U.S.C. § 160(c) (emphasis added). Through this amendment, Congress expressly set the universe of the Board's remedial power to grant monetary relief for aggrieved employees—it's limited to reinstatement and back pay. If Congress intended the Board to have broader power to direct monetary relief, such as ordering foreseeable or consequential damages, it would have said so in this provision. Otherwise, the Board would be precluded from awarding back pay when the employee commits misconduct, but it may still grant the same employee foreseeable or consequential damages. This reading makes little sense. Our duty is to interpret the law "as a symmetrical and

coherent regulatory scheme" and "fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 133 (2000) (simplified). The best reading of § 160(c) then cabins the Board's remedial measures over employees and forecloses the Board from ordering consequential or foreseeable damages. So while the Board may have discretion to devise remedies to further the Act, when ordering relief for individual employees, it's limited to reinstatement and back pay. This flows from the Board's narrow design to remedy only public rights.

The Board dismisses this textual restraint on its powers. It does so by misreading *Fibreboard Paper Products.* In that case, the Board ordered a company to resume certain business operations, to reinstate terminated employees with back pay, and to bargain with the union. 379 U.S. at 209. It was argued in that case that the Board's order violated § 160(c)'s prohibition against reinstatement and back pay for employees "discharged for cause." *Id.* at 217. As mentioned earlier, the Court determined that the provision precluded the Board from "reinstating an individual who had been discharged *because of misconduct*." *Id.* (emphasis added). But the Court observed that the provision did not "curtail the Board's power in fashioning remedies when the loss of employment *stems directly* from an unfair labor practice as in the case at hand." *Id.* (emphasis added). The Board takes this language to green-light the award of consequential damages. But it did nothing of the sort. Instead, with these sentences, the Court distinguished between employees fired *because of* misconduct and employees fired *because of* unfair labor practices. The Court simply reinforced the straightforward reading of the text—while the Taft–Hartley amendment implicated the former, it had nothing to do with the latter. Nowhere did the Court say that the Board could

disregard the obvious textual limitations on remediating employees.

If there were any doubts as to the limits of the Board's authority, the Court laid them to rest in *Burke*. In that case, the Supreme Court analyzed the remedies available under Title VII—an employee anti-discrimination statute. *See Burke*, 504 U.S. at 237–38 (analyzing 42 U.S.C. § 2000e–2(a)(1)). Title VII is important here because its "remedial scheme was expressly modeled on the backpay provision of the National Labor Relations Act." *Id.* at 240 n.10. Indeed, Title VII's remedial provision will look familiar. It's nearly identical to the Act's:

> [T]he court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g)(1).

Given their ties and similar language, we should follow the Court's reading of Title VII. The Court said, "Title VII does not allow awards for compensatory or punitive damages; instead, it limits available remedies to backpay, injunctions, and other equitable relief." *Burke*, 504 U.S. at 238. We should also follow how the Court defined the scope of Title VII's remedy: it "consists of restoring victims, through backpay awards and injunctive relief, to the wage and employment positions they would have occupied absent the unlawful discrimination." *Id.* at 239. Title VII doesn't

permit the compensation of a "plaintiff for any of the other traditional harms associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or other consequential damages (*e.g.,* a ruined credit rating)." *Id.* Indeed, "[n]othing in this remedial scheme purports to" do so. *Id.* In the Court's view, Title VII's limited remedies stood in contrast "to those available under traditional tort law." *Id.* at 240.

So let's recap. Title VII and the Act have similar purposes (the protection of employees), a similar remedial design, and similar textual language. And the Supreme Court has definitively established the remedies available under Title VII. The obvious response is to give the Act a similar reading. It's baffling that the Board argues otherwise.

But there's more evidence of this commonsense reading. In the Civil Rights Act of 1991, Congress amended Title VII to expressly add "compensatory and punitive damages" to its remedial scheme. *See* Pub. L. No. 102-166, 105 Stat. 1071; 42 U.S.C. § 1981a. If such damages were already available under the Title VII's original language, then Congress wouldn't have needed to act. Given their similarities, if Title VII required amendment to allow compensatory and punitive damages, logic dictates that the Act likewise would need amendment before granting the Board authority to order consequential or foreseeable damages.

\* \* \*

Thus, the Board exceeded its authority under § 160(c) in devising its newfound foreseeable-damages remedy.

### 2.

Even though § 160(c) is clear on its face, the Seventh Amendment commands that we resolve any ambiguity by rejecting the Board's claim of broad authority to order consequential or foreseeable damages. The Seventh Amendment guarantees the right to trial by jury "[i]n Suits at common law." U.S. Const. amend. VII. If administrative agencies, like the Board, seek to impose damages on a party that resemble those available in "Suits at common law," then the party must receive a jury trial. Issuing broad consequential damages—a tort remedy—thus implicates the Seventh Amendment. The dissenting Board members saw this danger clearly in opposing the Board's power grab. *See Thryv, Inc.*, 372 NLRB No. 22, at 16 ("We further observe that the Board faces potential Seventh Amendment issues if it strays into areas more akin to tort remedies.") (Kaplan and Ring, dissenting in part). So even if the Board's statutory authorities here are "susceptible of multiple interpretations," we should "shun an interpretation that raises serious constitutional doubts and instead . . . adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

The Supreme Court recently explained the scope of the Seventh Amendment. *See SEC v. Jarkesy*, 603 U.S. 109 (2024). The Court first reiterated that the right to a jury trial is "of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right has always been and should be scrutinized with the utmost care." *Id*. at 121 (simplified). The Court then concluded that the term, "Suits at common law," contrasted with cases in equity and admiralty. *Id.* at 122. The right to jury trial, then, applies to *all suits* "which are not of equity or admiralty jurisdiction, whatever may be the peculiar form

which they may assume." *Id.* (simplified). And it doesn't matter whether the claim is born of statute. The constitutional guarantee also encompasses statutory claims that are "legal in nature." *Id*. (simplified). And to determine whether a claim is "legal in nature," the Court directed that we consider both "the cause of action and the remedy it provides." *Id.* at 122–23. In the end, however, the *remedy* is the "more important consideration" in determining whether the Seventh Amendment applies. *Id.* at 123 (simplified). Indeed, in many cases, consideration of the *remedy* should be "all but dispositive." *Id.* But even when the Seventh Amendment applies, an exception exists. *Id.* at 127. Under the "public rights" exception, "Congress may assign [a] matter for decision to an agency without a jury, consistent with the Seventh Amendment." *Id.*

*Jarkesy* gives us some takeaways. First, it doesn't matter who brings the claims or how they are labeled. The Seventh Amendment applies even to administrative agencies and even if they call the claim something other than a "legal claim." *See id.* at 121–24. Second, we look at both the *nature* of the claim and the *remedies* the agency seeks. And the remedy *alone* may be enough to invoke the Seventh Amendment. *See id.* at 123–24. Third, we must consider if the "public rights exception" would still allow the administrative adjudication to go forward. *See id.* at 127.

Given these principles, reading § 160(c) to authorize the Board to award consequential or foreseeable damages would raise serious constitutional doubt under the Seventh Amendment.

First, consider the remedies the Board seeks to impose— arguably the most important concern. Recall, under its make-whole authority, the Board believes that it may make

employers pay for *any* foreseeable pecuniary harm that employees experience because of an unfair labor practice. This includes such attenuated harms as babysitting fees, credit card late fees, car payments, and attorneys' fees to sue landlords. But all this exceeds the purely equitable remedies that the Board may order.

Without question, the Board has the equitable powers to restore employees to the status quo through monetary relief. *See NLRB v. Jones & Laughlin Steel Corp*., 301 U.S. 1, 48 (1937) (the Board may order a monetary recovery as "an incident to equitable relief"); *Leviton Mfg. Co.*, 111 F.2d at 621 (the Board's authority to order payments "must . . . be confined to restitution for the wrong done"). But it has no authority to award money damages as a tort remedy. *See Jarkesy*, 603 U.S. at 123 ("[M]oney damages are the prototypical common law remedy"); *Teamsters v. Terry*, 494 U.S. 558, 570 (1990) ("Generally, an action for money damages was 'the traditional form of relief offered in the courts of law.'") (simplified).

To be sure, sometimes equitable restitution and money damages can look the same. In some cases, they can even lead to the same dollar award against a party. *See* Dan B. Dobbs, 1 Dobbs Law of Remedies 280 (2d. ed. 1993). Even so, they are distinct. And this distinction is significant:

> [T]hey are often triggered by different situations and always measured by a different yardstick. Damages always begins with the aim of compensation for the plaintiff . . . . Restitution, in contrast, begins with the aim of preventing unjust enrichment of the defendant. To measure damages, courts look at the plaintiff's loss or injury. To measure

> > restitution, courts look at the defendant's gain
> > or benefit.

*Id.* In other words, when distinguishing ordinary money damages at law from "equitable restitution and other monetary remedies available in equity," "the question is what has the owner lost, not what has the taker gained." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999) (simplified). And so, as a corollary, the question for equitable remedies is only the unjust gain of the taker or employer—not the loss to the owner or employee.

Explaining the difference between equitable monetary relief and monetary damages should illuminate the problem here. The Board wants to measure monetary relief from the perspective of the employee's loss—not the employer's gain. The Board's foreseeable-damages regime asks: What did the *employee* lose? What fees did the *employee* incur because of the unfair labor practice? What opportunities did the *employee* forgo because of the proscribed conduct? But this would be inappropriate under equity. Equitable relief should ask only what the employer has unjustly gained. When employers withhold pay from employees based on unlawful employment actions, employers unjustly keep the employees' wages and so equitable relief equates to back pay—exactly as contemplated by § 160(c). On the other hand, the award of broad foreseeable damages goes beyond equitable restitution and crosses into the tort remedy of money damages.

Indeed, given how far-reaching the Board views foreseeable damages—encompassing any *indirect* harm no matter how remote from the unfair labor practice—these awards are nearly indistinguishable from punitive damages, which only courts of law may impose. *See Jarkesy*, 603 U.S.

at 123–25. As the dissenting members noted, the Board's new consequential-damages regime isn't even limited by the requirement of "proximate cause"—which makes the Board's remedy "go well beyond tort law." *Thryv, Inc.*, 372 NLRB No. 22, at 19 (Kaplan and Ring, dissenting in part). By awarding damages for harms that are not directly or proximately caused by unfair labor practices, we move from mere compensation to granting a windfall to aggrieved employees. And when "compensatory damages exceed pure compensation," they may become "punitive." *See* Dobbs, Law of Remedies 455.

True, the Board tries to get around this conclusion by denying any punitive motive for its new remedy. But let's look at what the Board said. The Board claimed the remedy wouldn't be punitive because it applied to all cases, rather than just to extraordinary ones. *Thryv, Inc.*, 372 NLRB No. 22, at 17. Yet the Board conceded that "if we were to issue this make-whole relief only to address the most deplorable or flagrant violations of the Act, these remedies run the risk of becoming punitive rather than restorative." *Id.* In other words, the Board acknowledges the punitive nature of its expansive foreseeable-harm remedy but understands that applying it selectively would make it blatantly punitive, which it knows it can't do. But a punitive measure is still punitive even if it applies across the board.

Thus, based on the remedies *alone*, the Board's imposition of foreseeable damages would implicate the Seventh Amendment—giving us every reason to avoid reading § 160(c) so broadly.

Second, the "close relationship" between the Board's efforts to block unfair labor practices and the common-law tort of wrongful termination supports reading the Board's

remedial powers narrowly. *See Jarkesy*, 603 U.S. at 125. Take this case. The Board asserts that Macy's violated the Act by locking out employees without clearly and fully informing them of the conditions for their reinstatement— effectively terminating them. *See Macy's, Inc.*, 372 NLRB No. 42, at 20. But California, where most of the Macy's stores were located, recognizes a tort cause of action for wrongful terminations that violate public policy. *See Freund v. Nycomed Amersham*, 347 F.3d 752, 758 (9th Cir. 2003) (requiring that the public policy "inures to the benefit of the public rather than serving merely the interests of the individual" (simplified)); *see also* American Law of Torts § 34:83 (2024) (observing that the tort of wrongful termination exists when an (1) "employee was discharged by his or her employer" and (2) "the employer breached a contract or committed a tort in connection with the employee's termination."). And the wrongful-termination tort has a historical pedigree tracing back to the English common law. *See* American Law of Torts § 34.85; *see also* 1 William Blackstone, Commentaries \*413 ("[N]o master can put away his servant, or servant leave his master, either before or at the end of his term, without a quarter's warning; unless upon reasonable cause to be allowed by a justice of the peace[.]").

Consider the individualized assessments necessary to prove the foreseeable harms for each employee. As the Board admitted, "aggrieved employees will . . . have to submit evidence to substantiate pecuniary harms for which they seek reimbursement" before the Board's ALJs. *Thryv, Inc.*, 372 NLRB No. 22, at 11. What then distinguishes these Board proceedings from individualized tort claims in federal or state court? Not much.

Thus, both the Board's actions and wrongful-termination tort "target the same basic conduct," *Jarkesy* 603 U.S. at 125,— preventing wrongdoing in the employment context. *See also Lewis v. Whirlpool Corp.*, 630 F.3d 484, 487–89 (6th Cir. 2011) (noting the overlap between wrongful-termination claims and the Board's jurisdiction). Indeed, the Board's jurisdiction so overlaps with the wrongful-termination tort that it may preempt federal or state tort actions. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959); *Platt v. Jack Cooper Transp., Co.*, 959 F.2d 91, 94 (8th Cir. 1992); *Lewis*, 630 F.3d at 487. While not necessarily a perfect overlap, no "precise[] analog[ue]" is necessary under the Seventh Amendment. *Tull v. United States*, 481 U.S. 412, 421 (1987). Rather, the jury right "extends to statutory claims unknown to the common law, so long as the claims can be said to sound basically in tort, and [they] seek legal relief." *Monterey*, 526 U.S. at 709 (simplified). So the basic "legal" nature of the claim here supports rejecting the Board's expansive remedial powers.

Finally, the public rights exception doesn't justify the Board's broad assertion of remedial powers. The Court has reminded us that this exception is *only* an exception. *Jarkesy*, 603 U.S. at 131. After all, "[i]t has no textual basis in the Constitution." *Id.* So "[e]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." *Id.* at 132 (simplified). Thus, we don't focus on whether an action "originate[s] in a newly fashioned regulatory scheme." *Id.* at 133 (simplified). Rather, "what matters is the substance of the action, not where Congress has assigned it." *Id.* at 134.

And the Court has made clear that the public rights exception must remain a narrow one. When the Court has recognized a "public rights" exception, it is based on "centuries-old," "background legal principles." *Id.* at 131. Indeed, the Court has only recognized a few categories of administrative adjudications that fall within the exception: the collection of revenue; customs law; immigration law; relations with Indian tribes; the administration of public lands; and the granting of public benefits, such as payments to veterans, pensions, and patent rights. *Id.* at 129–30. On their face, these categories have little resemblance to traditional legal claims—they all involve interests that would not exist without the federal government. In contrast, in *Jarkesy*, the Court refused to expand the list to include administrative adjudications over conduct that resembles "common law fraud." *Id.* at 134. Thus, courts should be reluctant to expand the exception beyond the enumerated historical categories.

The Board's new make-whole remedy is identical to traditional legal-claim remedies vindicating private rights and doesn't fit within the public-rights exception. The Board's remedy goes beyond defending the public interest in federal labor policy and instead targets "the wrong done the individual employee," which falls outside the Board's authority when fashioning unfair labor practice remedies. *Vaca v. Sipes*, 386 U.S. 171, 182 n.8 (1967). So the award of consequential or foreseeable damages bears little relation to public rights, and the Board cannot escape this conclusion by merely calling it a "make-whole" or "equitable" remedy. *See Jarkesy v. SEC*, 34 F.4th 446, 457 (5th Cir. 2022) ("Congress cannot change the nature of a right, thereby circumventing the Seventh Amendment, by simply giving the keys to the SEC to do the vindicating."). However

appropriate a consequential-damages regime may be in the labor context, when an administrative agency strays into the realm of legal remedies, that's a matter for Article III courts not administrative tribunals.

And the Board is wrong to contend that the Court settled the Seventh Amendment question back in the 1930s. In *Jones & Laughlin Steel Corporation*, the Court concluded that the Seventh Amendment didn't preclude the Board from ordering the "payment of wages for the time lost by the discharge"—in other words, back pay. 301 U.S. at 48. The Amendment wasn't implicated, the Court said, because the ordered back pay was "incident to equitable relief," even though the same "damages might have been recovered in an action at law." *Id.* Key to the Court's opinion, then, was that back pay was a form of equitable relief. Indeed, the Court has emphasized the equitable nature of the back-pay remedy. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415–418 (1975) (characterizing back pay awarded against employers under Title VII as equitable). Here, however, the Board seeks far greater remedial authorities. It doesn't just seek damages "incident to equitable relief," but it seeks consequential or foreseeable damages associated with a "[s]uit at common law." So *Jones & Laughlin* isn't the end of the analysis when the Board imposes remedies far beyond back pay. Based on precedent since the 1930s, the Board's award of consequential damages would contravene the Seventh Amendment's right to a jury trial.

To be clear, the Seventh Amendment doesn't invalidate all Board remedial authorities to direct monetary relief. As limited by § 160(c)'s express authority to order "back pay," the Board may act consistently with the Seventh Amendment. But when the Board strays from the text and seeks extra-statutory authorities, like the power to direct

consequential or foreseeable damages, then the Seventh Amendment has something to say. We thus must read § 160(c) as precluding the type of monetary relief the Board seeks here. *See Jennings*, 583 U.S. at 286.

## II.

### The Board's Merits Decision Was Wrong

Even worse, we didn't need to reach the remedy issue at all. Instead, the Board's decision to conclude that Macy's committed an unfair labor practice was arbitrary and capricious and unsupported by the evidence. The Board concluded that Macy's committed an unfair labor practice under § 8(a)(1) and (3) of the Act by not reinstating the Union members after their offer to return to work and by locking them out without informing them of the terms to end the lockout. *Macy's, Inc.*, 372 NLRB No. 42, at 20. But this conflicts with the Act for two reasons. First, the Board was wrong to conclude that Macy's offensive lockout was "inherently destructive" because it took two-business days to communicate its offer to end the lockout. Second, the Board overlooked some key facts in deciding that Macy's actions were not a proper defensive lockout.

Section 8(a)(1) and (3) of the Act "make it an unfair labor practice for an employer 'by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.'" *Fresh Fruit & Vegetable Workers Loc. 1096 v. NLRB*, 539 F.3d 1089, 1096 (9th Cir. 2008) (quoting 29 U.S.C. § 158(a)(1), (3)). To find a violation of these provisions, "the relevant inquiry is whether or not the employer's action likely discouraged union membership and was motivated by anti-union animus." *Id.* So usually, evidence of discriminatory conduct *and* discriminatory

intent are necessary. But this isn't always the case. Sometimes conduct is so "inherently destructive," that "improper motive" can be inferred. *Id.*

We've described the framework for analyzing "inherently destructive" conduct as this:

> If employer conduct is "inherently destructive," the Board may find an improper motive regardless of evidence of a legitimate business justification. . . . If, on the other hand, "the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight,'" and the employer establishes a legitimate and substantial business justification for its actions, there is no violation of the Act without a finding of an actual anti-union motivation.

*Id.* (citing *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33 (1967)). Both the Board and Macy's agree that this *Great Dane* framework governs this case.

Establishing "inherently destructive" conduct is a high bar. It requires conduct that "carries with it an inference of unlawful intention *so compelling* that it is justifiable to disbelieve the employer's protestations of innocent purpose." *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 311–12 (1965) (emphasis added). The conduct must have "*far reaching* effects which would hinder future bargaining" and "creat[e] visible and *continuing* obstacles to the future exercise of employee rights." *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976) (emphasis added). In other words, the conduct must have "the natural tendency . . . to *severely* 'discourage union membership

while serving no significant employer interest.'" *Fresh Fruit & Vegetable Workers Loc*., 539 F.3d at 1097 (quoting *Am. Ship Building*, 380 U.S. at 312) (emphasis added). Thus, the effect of the conduct must be more than temporary or slight. It must *significantly* alter the bargaining relationship. In sum, there must be "*no question* that the employees were being punished for their union activities." *Id.* (emphasis added).

The Board hasn't met that standard here.

## A.

There's nothing inherently problematic with the use of lockouts. *Am. Ship Bldg.,* 380 U.S. at 308–313. Proper offensive lockouts may occur when an employer locks out employees "in support of legitimate bargaining demands." *Boehringer Ingelheim Vetmedica, Inc.*, 350 NLRB 678, 679 (2007). The Board never found that Macy's had anti-union animus in initiating its lockout and so the Board must show that Macy's actions were "inherently destructive" to support its charge. But all the facts reveal that the delay in providing a new proposal at the time of the lockout had no "far reaching," "continuing," or "sever[e]" effect on collective bargaining. To the contrary, the lockout served a legitimate economic purpose.

Let's recap the facts from 2020:

- On August 31, Macy's gives its best and final offer to the Union.

- On September 4, the Union's members begin to strike.

- On October 8, Macy's informs the Union that its best and final offer will expire on October 15.

- On October 15, Macy's best and final offer expires.

- On November 25, the Union presents a counter proposal to Macy's.

- On December 4, Macy's rejects the Union's counter proposal. That Friday evening, the Union unconditionally offers to return to work "immediately" in an email sent after hours on the East Coast. Macy's asks the Union to hold off on returning to work and promises to respond by the close of business on Monday. The Union asks if "this mean[s] you are locking them out till Monday?"

- On December 5–6, Macy's reiterates its request for time to respond, noting the "administrative, logistical, and economic" challenges of reinstating employees on short notice. The Union refuses to accommodate Macy's and declares that its members will return to work unless they're locked out. Macy's again asks for time because "[t]hey have been out for 90+ days, and to think you can just flip a switch and have them back is not possible."

- On December 7, Macy's notifies the Union it will not reinstate its members "until there is an agreement in place," which is "in support of [its] bargaining position." Macy's proposes dates for new bargaining sessions, including a date on December 10.

- On December 10, Macy's presents a new collective bargaining agreement proposal to the Union.

So the Union demanded to return to work within one business day on a Friday evening. Macy's reasonably asked the Union to hold off on returning to work while it figured

INT'L UNION OF OPERATING ENGINEERS v. NLRB          75

out its position over the weekend. On Monday, Macy's told the Union that it was locking out the Union members in support of its bargaining position and notes that a new bargaining agreement must be reached before reinstatement. Two days later, Macy's and the Union were back at the bargaining table with Macy's presenting a new proposal. The Board decided that this *two-day delay* in informing the Union of its latest offer was an unfair labor practice. Indeed, the Board held that Macy's failure to communicate a new offer by Monday morning (one business day) was an unfair labor practice. *See Macy's, Inc.*, 372 NLRB No. 42, at 20 ("the lockout was unlawful at its inception, on December 7"). But this is not even close to meeting the exacting standard of "inherently destructive" conduct.

We've already been skeptical of the need to *immediately* reinstate employees after an offer to return to work. In *Fresh Fruit & Vegetable Workers Local*, after a strike and 14-year long lockout, an employer offered to reinstate striking Union workers but delayed reinstatement for one month. 539 F.3d at 1093–94. The employer justified the delay by the need for the employees to give notice to their existing employers and to allow for a particular manager to train the returning employees. *Id.* at 1094. The Board thought that this delay was inherently destructive and ordered back pay. *Id.* at 1094–95. We rejected the Board's conclusion. *Id.* at 1096. We explained that the one-month delay after a 14-year lockout did not meet the high bar for "inherently destructive" conduct. *Id.* at 1097. Given the "short" reinstatement delay "relative to the lockout period," we concluded the delay couldn't be viewed as "punishment for a protected activity." *Id.* "After a fourteen-year lockout," we said, "a delay of a few more weeks prior to reinstatement does not *necessarily express anti-union animus* beyond that expressed by the

lockout itself." *Id.* (emphasis added). Rather, the delay would be understood as the time "necessary and normal to accomplish reinstatement," not as an attempt to "obstruct or discourage employees from exercising their statutory rights." *Id.* Thus, we reversed the Board's conclusion of a violation of the Act. *See id.* at 1100.

As in *Fresh Fruit*, the Board didn't consider the totality of the circumstances before concluding that Macy's committed an unfair labor practice. The Board ruled that the lack of an immediate, clear, and complete proposal to the Union within one business day of the offer to return constituted "inherently destructive" conduct. But that's wrong. After the Union engaged in a three-month strike, rejected Macy's final offer, and then sought to jam Macy's with a Friday night return-to-work offer, Macy's taking a mere two business days to formulate and communicate a new, detailed offer can't be viewed as anti-union animus. Given the relatively short period in which Macy's developed a new offer after the months-long strike, nothing shows that the minor delay in communicating its latest offer after the lockout was *necessarily* made to punish the Union for its protected activity or was *necessarily* an attempt to obstruct or discourage the employees' union activity. Instead, the 48-hour delay could be viewed as the "necessary and normal" time to figure out Macy's response to the Union's unexpected return-to-work offer and to draw up a new proposal. *See id.* at 1097. Without any evidence of anti-union animus, the Board hasn't shown how the short delay here had more than a "comparatively slight" impact on the Union under *Great Dane Trailers*, 388 U.S. at 33. Establishing a hard-and-fast rule that an employer *must* provide a "timely, clear, and complete offer" before engaging in an offensive lockout within one-business day

was arbitrary and capricious.  *See Macy's, Inc.*, 372 NLRB No. 42, at 1.

Indeed, labor disputes often involve complex circumstances that can't be resolved on the short fuse that the Board requires here.  Under the Board's arbitrary rule, Macy's could have only responded two ways to the Union's Friday-night offer: (1) immediately reinstate the workers and lose its bargaining position after the three-month strike, or (2) institute the offensive lockout but come up with a new offer essentially *overnight*.  Nothing in the Act requires these grim choices.

Well, couldn't Macy's have immediately revived its final offer to comply with these rules?  Yes, but that would defeat the purpose of the "best and final" offer as a bargaining tactic.  Now, a union can decide whether an offer is a best and final one or not.  All a union must do to resurrect an expired offer is make an unconditional offer to return to work on short notice before a weekend.

But, what's wrong with forcing Macy's to reinstate the employees by Monday morning?  First, this ignores the enormous logistical difficulties with returning dozens of striking employees to work over a weekend.  Second, this would also weaken Macy's bargaining position by decreasing the need for an agreement.  Unless an employer shows anti-union animus, the Act doesn't permit the Board to force a one-sided solution in a labor dispute.

And nothing in the Board's precedent supports its draconian ruling here.  Start with *Dayton Newspapers*.  In that case, an employer locked out several delivery drivers after a one-day strike.  *In re Dayton Newspapers, Inc.*, 339 NLRB 650, 650 (2003).  Negotiations and the lockout continued for months.  But, on December 23, the union made

an unconditional offer to return to work. *Id.* at 651. Four days later, the employer rejected the offer and communicated that the union had to accept several "changed circumstances," including unspecified "operational changes." *Id.* The next day, the union agreed to the "changed circumstances," although it noted that the "operational changes" condition may need further negotiations. *Id.* More than a month later, on February 4, the employer nonetheless rejected the union's offer, suggesting that the union hadn't accepted all the conditions of reinstatement. *Id.* at 652. The Board concluded that the employer engaged in an unfair labor practice in not reinstating the locked-out drivers because the employer failed to "clearly and fully set forth" the conditions of reinstatement. *Id.* at 656. In particular, the demand for acceptance of "operational changes" was "unclear and changing" and became a "moving target." *Id.* Under these conditions, the union couldn't "intelligently evaluate its position and obtain reinstatement." *Id.*

The differences between *Dayton Newspapers* and this case are glaring. First off, notice that the negotiations over reinstating the drivers took place over weeks—not days or hours, as here. The Board never criticized the employer for taking *too long* to communicate its condition of reinstatement—it criticized the employer for not being clear on the conditions themselves. *See id.* at 656–58. In contrast, the Board here held that Macy's failure to communicate a new offer by Monday morning—one business day later— was an unfair labor practice. *See Macy's, Inc.*, 372 NLRB No. 42, at 20. So the Board is punishing Macy's for taking a total of 48 hours more to communicate its newest offer to end the lockout.

Indeed, Board precedent requires parties to afford each other fair time to evaluate and respond to offers. In *Alden Leeds,* the Board concluded that giving a union "only one working day's notice, in which to evaluate and understand [employer's] uncertain, ambiguous, and confusing offer, vote on it and accept it, is clearly insufficient and not the 'timely' notice required by Board precedent." 357 NLRB 84, 95 (2011). So the Board violates its own precedent to reach its desired outcome. If that's not arbitrary and capricious, nothing is. We then just give the Board a blank check to do what it wants in the labor context.

## B.

As if it weren't enough, the Board gives us one final reason to deny the Board's petition. Macy's argues that it had good-faith concerns about the Union's actions during the strike that justified a defensive lockout. According to Macy's, strikers orally abused its employees, attacked its customers, flouted COVID safety protocols, caused a sewage backup by blocking a drain outside its San Francisco store, and sabotaged its facilities. It was especially concerned about having the employees return to work given the upcoming holiday season, which accounts for much of the company's profits. *See Macy's, Inc.*, 372 NLRB No. 42, at 20. The Board rejected Macy's defensive lockout justification because it believed that the defensive lockout concern was simply a pretext to pressure the Union to accept the company's offer. But that conclusion was arbitrary and capricious and unsupported by the record.

To justify a defensive lockout, an employer need only be "*reasonably concerned*" about the employees' actions. *See Sociedad Espanola de Auxilio Mutuo y Beneficiencia*, 342 NLRB 458, 462 (2004). This is a relatively low bar. While

we must defer to the Board's factual findings if they are supported by substantial evidence, we have a duty to correct when the "administrative agency has made an error of law." *NLRB v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. and Gen. Pipefitters of N.Y.*, 429 U.S. 507, 522 n.9 (1977). Here, neither the ALJ nor the Board cited the "reasonably concerned" standard and only looked at whether Macy's *proved* the incidents of misconduct by Union members. But that's not the legal standard to justify a defensive lockout. All that's necessary is that Macy's show that it was "reasonably concerned" about the misconducted. Thus, we should have remanded on this basis alone. *See id.*

Moreover, as Macy's raised to the Board, the ALJ glossed over all the evidence of Macy's "good faith" belief that the striking employees engaged in misconduct or sabotage. Despite our deference to factual findings, the ALJ and the Board can't ignore significant evidence contrary to its position. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); *Lakeland Health Care Assocs., LLC v. NLRB*, 696 F.3d 1332, 1335 (11th Cir. 2012) (noting the Board "cannot ignore relevant evidence that detracts from its findings" (simplified)).

Neither the ALJ nor the Board considered the fact that, before the lockout, Macy's *twice* sought injunctive relief in state court against the Union. On November 20, Macy's filed a motion for a preliminary injunction alleging causes of action against the Union for nuisance, trespass, false imprisonment, assault, battery, and intentional interference with prospective economic relations. Before the lockout, the state court denied the request without prejudice because

Macy's had not yet proven irreparable harm.  But the state court did not appear to rule on the facts of Macy's allegation. By going to state court on the very same concerns as raised for the defensive lockout, Macy's showed it was "reasonably concerned" with the Union members' actions.  Indeed, filing for a false or bad-faith injunction would have subjected Macy's to judicial sanctions.  Yet the ALJ and the Board never said why this evidence wasn't sufficient to prove Macy's defensive reasons.  By not accounting for these significant facts, the ALJ and the Board acted arbitrarily, capriciously, and without support.

### III.

Let's recap the Board's extraordinary actions here.  After a lengthy and acrimonious strike, the Union made an unconditional offer to return to work—expecting to be accommodated within one business day.  On the next workday, Macy's responded that it was locking out the striking employees in support of its bargaining position. True, Macy's didn't have an offer on the table then, but that's not unexpected given that the Union had rejected its best and final offer.  In any case, Macy's put together a new offer two days later.  Despite these efforts, the Board determined that Macy's committed an unfair labor practice.  If this wasn't unusual enough, the Board then imposed extraordinary damages—making Macy's pay for "all direct or foreseeable harms" that occurred to the employees since the lockout. Until recently, the Board never claimed the authority to order consequential damages as here.  And the Board ignores the obvious statutory and constitutional roadblocks to this newly claimed authority.  The majority largely ignores these concerns and just proclaims that we must defer to the Board because it is at the "zenith" of its discretion.  That's incorrect. The law and the Constitution are supreme here—not the

bureaucrats of the Board. We should not have condoned this government overreach.

I respectfully dissent.